UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :

    v.                               :         1:21-CR-108 (TSC)

MICHAEL FOY              :

**DEFENDANT'S EMERGENCY BOND REVIEW MOTION**

Michael Foy is detained without bond at the D.C. Jail, having arrived on March 9, 2021 from Grady County, Oklahoma. He was arraigned on March 10, 2021 in this Court. Mr. Foy was detained by Magistrate Judge Patricia Morris in the U.S. District Court for the Eastern District of Michigan. He was detained on January 24, 2021, based on a complaint charging, *inter alia*, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(b). The government requested pretrial detention of Mr. Foy, pursuant to 18 U.S.C. § 3142(f)(1)(A) and 18 U.S.C. § 3142(f)(1)(B), asserting that there are no conditions or combination of conditions that will reasonably assure the safety of the community and that Mr. Foy is a serious flight risk.

Despite the Magistrate Court's ruling, the government has not proven, by clear and convincing evidence that he poses a danger to the community and because the government cannot show, by clear and convincing evidence, that there are no conditions nor combination of conditions of release that will reasonably assure the safety of the community. In addition, the government has not proven, by preponderance of the evidence, that Mr. Foy is a serious flight risk.

## Introduction

Mr. Michael Foy is a young man who has spent his young life in service of others. He worked as a certified nursing assistant in a nursing home and served this country for nearly five years. And on January 6, when people were being crushed at his feet, he acted in defense of those others. Mr. Foy is innocent of assault because his actions were legally justifiable. He saw individuals in imminent danger of bodily harm and used a reasonable amount of force to protect and defend those people who were being trampled.

## Factual Background

Mr. Foy is a 29 year-old man with strong ties to the Michigan community with exceptionally strong family support. See Exhibit C. Most recently, he served in the United States Marine Corps from 2015 until June 2020 when he was honorably discharged after advancing to the rank of Corporal. Until last year, he was serving in the Marines as a Supervisor on base in North Carolina and before that, he was also a Marines Heavy Equipment Mechanic both here and abroad. His overseas service consisted was in Okinawa from 2015 to 2017. For his service, he received the Good Conduct Medal from the Commandant of the Marines and has also been commended for assisting the Wounded Warrior Battalion in Camp Lejeune, North Carolina. Although Mr. Foy was not in combat – his role was to maintain military equipment - he suffered significant psychological casualties from his service. In 2019, he was diagnosed with unspecified Anxiety Disorder while on Active Duty, the first of three significant diagnoses. In June 2020, he was discharged into a civilian life upended by a worldwide pandemic.

Predictably, Mr. Foy could not find a job when he returned home. In June 2020, the unemployment rate in Michigan was 14.8%. https://www.michigan.gov/dtmb/0,5552,7-358-82543-534197--,00.html (last accessed, Mar. 3, 2021). When Mr. Foy could not find work, he

turned his attention to helping others.  He volunteered with the Michigan Mountain Biking Association and maintained and created trails so that people could manage the pandemic with safe recreational activities.  He also enrolled into the Oakland County Community College to pursue a business degree. Although he loved this work and wanted to advance his education, he still struggled to transition into civilian life.

From the outset, Mr. Foy struggled with mental health issues and he sought treatment at the Veterans Administration Hospital in Ann Arbor, Michigan.  In December 2020, Mr. Foy and his family noticed that things were getting worse.  He requested an additional evaluation and was, for the first time, diagnosed with Major Depressive Disorder and Post-Traumatic Stress Disorder.  He received this diagnosis on December 23, 2020, two weeks before January 6th. He was placed on new and additional medication which he began to take in the last week of December.

After the election, Mr. Foy was repeatedly told by Donald Trump and the Republican Party that President Trump had been reelected and that the election was in the process of being stolen.  Inundated by these reports through television and internet news sources, Mr. Foy believed what he was told and attended a local demonstration to peacefully voice his opinion that the 2020 election was tainted.

According to the government's investigation, Mr. Foy went to the January 6th protest alone.  Mr. Foy initially had not plans to attend the protest in Washington D.C.  But in the early morning hours of January 6th, he decided to drive from his home in Michigan to the District.  Without a plan to even sleep overnight, Mr. Foy packed some food and water, grabbed his Trump flag and attached it to a makeshift flagpole – a hockey stick that he had sitting around his residence.  He then drove to the District, stopping only for gas and bathroom breaks.

Mr. Foy's last-minute decision to attend the protest is consistent with his social media presence - he had not coordinated with anyone over social media. He had no intentions of violence, insurrection, entering the Capitol or obstructing the certification. He wanted to hear President Trump speak in person and voice his support for the incumbent who told him that the election was not yet completed.

Video evidence shows that on January 6th, Mr. Foy used the makeshift flag pole to defend individuals being trampled by advancing police officers. Mr. Foy was positioned with hundreds of other demonstrators who were outside the portico leading into the Capitol outside the West entrance. The individuals, a mix of peaceful protestors and those seeking to enter the building and disrupt the certification process, chanted U.S.A. and sang the Star-Spangled Banner. Meanwhile, a number of police officers gathered inside the Capitol just inside the doors of the West entrance.

About an hour earlier, before Mr. Foy arrived on the scene, officers were inside glass doors and were attempting to close the doors to keep out the demonstrators. It has widely been reported that an officer was trapped at one of those doors, shouting in pain. But an hour later, at the time of this incident, the scene had changed. The officers had pushed the crowd outside the doors and back several yards and were then at the mouth of the portico. Directly in front of the officers was a packed crowd of people. A few feet behind them were several steps and a metal railing.

Exhibit A is the body worn camera footage of an officer who pushed to the front of the line of officers. Once he does so, there appears to be some jostling between officers and civilians in front of them. Outside the view of the camera, a young lady named Rosanne Boyland, had fallen on the stairs. Her friend, Justin Winchell, was yelling at people to clear the

way so she could have space.  Some individuals moved aside, backing officers into the portico.  Officers shoved back and pushed civilians on top of one another.  The officer with the body worn camera then held a baton in two hands and pushed the back of the civilian. At that time, a number of the protestors began to warn the officers that there were individuals who had fallen on the stairs that were being crushed.  In the two minutes before Mr. Foy became involved, the following statements are heard on Exhibit A[1]:

- Back up!  Back up!  Exhibit A at 2:24.

- I'm trying to get out!  Help me please!  Exhibit A at 2:30.

- I'm trying, I'm trying to get out, please, I'm trying to get out.  I'm on the ground.  Exhibit A at 2:34

- There's people under here!  There's people pressed under here! (pointing to protestors being pushed by police)  Exhibit A at 2:53.

- Get up off the steps!  Cops! Cops! You gotta stop!  Push back!  Exhibit A at 3:12.

- You gotta push back!  Quit pushing people.  Exhibit A at 3:16.

- Stop you're crushing him.  You gotta let up a second, you're crushing people.  Exhibit A at 3:19.

- Someone's being crushed!  Let 'em out!  Get her up.  Get her up, please, save her life!  Exhibit A at 3:38.

- Stop!  Stop!  She's gonna die!  She's gonna die!  Exhibit A at 3:59.

- Please stop pepper spray, we're trying to (inaudible)! Exhibit A at 4:04.

- People are getting tased!  Exhibit A at 4:13.

---

[1] Exhibit A was used in Mr. Foy's initial detention hearing. The subtitles, which do not capture all that was said, was added by the defense for demonstrative purposes.

- Save her!  Save her!  Exhibit A at 4:15.

- She's gonna die!  She's gonna die!  She's dead! Exhibit A at 4:43

- She's dead!  She's dead! I need somebody, she's dead!  I need medical!  Exhibit A at 5:01.

The officers either did not hear or did not heed the warnings and appear to push forward. In Exhibit A, officers are pushing individuals back towards the stairs.  Exhibit A at 1:52; 2:22; 2:41; 3:01; 3:11; 3:17; 3:26; 3:34-3:39;  3:45-4:24; 4:33-4:45.  Despite being told that people were pressed under them, the officers continued to push the individuals with their batons.  And while it is not apparent on this particular video, the statements of individuals in the crowd suggest that officers were using pepper spray and tasers.[2]



---

[2] The defense has requested expeditious production of all body worn camera footage relating to the alleged assault under *Brady v. Maryland* and the Due Process Protections Act because this evidence is likely to demonstrate Mr. Foy's innocence.

As officers pushed, individuals started falling on top of each other. Beneath them was another layer of people, some who had fallen on the ground.





Exhibit A at 4:20.

People shouted "Save her!" and "Help," a few feet from where Mr. Foy was standing. For a few minutes, he did nothing of note, standing at the bottom of the steps and observing what was happening. As the scene intensified, a flagpole was picked up and thrown in the direction of the officer. Two individuals bent down to try to help the young woman lying at the bottom of the steps. An officer on body worn camera then extended his asp baton to its full length. At that moment, Mr. Winchell turned around and yelled "I need help!" in Mr. Foy's direction. At that moment, Mr. Foy took a few steps forward holding the sign attached to the hockey stick. He started swinging the hockey stick, creating space between the officers and the young lady on the ground. He did so for about 15 to 20 seconds before retreating from the scene. Exhibit B at 4:58. Seconds later, a man is heard screaming at the police, "I fucking saw them kill a girl!" Exhibit A 5:46. Less than a minute later, an apparently unconscious woman, later identified as Rosanne Boyland, was dragged from the steps.



**Argument**

Consistent with the presumption of innocence and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(b) and (c)(1)(B). The Supreme Court has explained: "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); see also *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose."). As a general rule, courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." Id. at 1405.

The government bears the burden of demonstrating, by clear and convincing evidence, that preventative detention is necessary to ensure the safety of the community. Although a rebuttable presumption applies here for detention, Mr. Foy's lack of criminal history, military service and prolonged evidence of his good character rebut the presumption. In addition, the government has not demonstrated that Mr. Foy is a serious risk of flight.

As a veteran with diagnosed mental illnesses, Mr. Foy is eligible for mental health treatment at the Veterans Administration treatment center in Battle Creek, MI. The Pretrial Service Report from Michigan notes that Department of Veteran Affairs therapist, Matt Brown reported "the defendant could be referred by his psychiatrist to a cost-free thirty day inpatient

mental health and substance treatment program located at the Battle Creek, Michigan VA Medical Center."[3]

    A. Mr. Foy rebuts the presumption for detention.

Although Mr. Foy is charged with one offense that triggers a rebuttable presumption, he easily rebuts that presumption. The rebuttable presumption does not require that the defendant carry the burden of proof or persuasion but rather, requires the defendant "to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 A.2d 364, 371 (D.C. Cir. 1985). Instead, a defendant "bears a limited burden of production – not a burden of persuasion – to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." "A defendant's burden of production to rebut the Bail Reform Act's presumption of detention is not heavy." *United States v. Dabney*, 2020 WL 1866750 at *2 (D.D.C. 2020) (finding presumption rebutted with strong ties to the community, family support and lack of adult criminal history); see also *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community." *Id.* Mr. Foy has no prior criminal convictions. He has spent much of his adult life in service to the United States. That very service has left him broken – he has been diagnosed with three significant mental health conditions that contextualizes the alleged conduct from January 6th. In addition, the presumption does not account for conduct in response to the risk of bodily harm. Mr. Foy's conduct did not occur until the need to use force arose. When the continued advancement of the police began to crush people at his feet, Mr. Foy used reasonable

---

[3] Counsel has learned that the treatment program options a Battle Creek VA Hospital span from 30 to 90 days inpatient.

force – a fact that substantially undermines the government's case as well as any suggestion that he is dangerous.

      B.  The Government has not proven, by clear and convincing evidence, that preventative detention is necessary to ensure the safety of the community.

Under the Bail Reform Act, the Court must consider the following factors when determining whether the government has set forth clear and convincing evidence that Mr. Foy be detained. They are: 1) the nature and circumstances of the offense charged; 2) the weight of the evidence; 3) the history and characteristics of the person charged; and 4) the nature and seriousness of the danger posed by the person to any person in the community if he is released. 18 U.S.C. 3142 (g).

Weighing all of these factors, this Court should release Mr. Foy.

      1.  Nature and Circumstances of the Offense Charged

The nature and circumstances of the offenses charged weigh in favor of release. Presumably, the government has requested detention for Mr. Foy because of his alleged assault with his makeshift flagpole – a hockey stick which was no more dangerous than the hundreds of flagpoles or makeshift flagpoles used in this and other demonstrations. Although he is charged with a number of other offenses, others who have been charged with those same offenses have nearly universally been released.

The nature and circumstances of the offense factor must focus on the approximately twenty-five second window in which Mr. Foy is alleged to have assaulted police. Those twenty-five seconds of chaos, precipitated by individuals falling and getting crushed, are not representative of whether Mr. Foy is a danger to the community outside of those very unusual circumstances.

The events of January 6th, and Mr. Foy's participation in them, was a moment in history that has now passed. In the past two months, the events have thankfully not been repeated. There is no alluring event - no presidential call to duty for protestors like Mr. Foy, individuals who had no connections to any right-wing groups, are not white supremacists but were simply supporters of Donald Trump and became involved only because the President insisted that patriotism required action.

Moreover, Mr. Foy did not act violently either before or after he stood feet away from unarmed people being crushed and a woman being trampled to death. There is no evidence that he destroyed any property, broke or attempted to break windows with his hockey stick or acted disrespectfully inside the building. He did not assault any officers or confront any officers. He did not threaten anyone. Aside from that 25 second window, Mr. Foy acted no differently than hundreds of others who have been released. And that 25 second window was precipitated by witnessing the trampling of a young woman. As discussed below, it was objectively reasonable for Mr. Foy to believe that the police were causing death or at least imminent bodily harm. The available video evidence, viewed fairly, shows just that. And it was reasonable for him to use force to try and prevent that physical harm and reasonable to answer what he believed to be calls for his help.

2. The weight of the evidence.

The evidence of Mr. Foy's identity is strong but the analysis does not end there. Viewing all of the evidence, Mr. Foy is innocent and the weight of the evidence strongly favors his release.

There is strong evidence that Mr. Foy acted in defense of others in using non-deadly force and the government is unlikely to prove, beyond a reasonable doubt, otherwise. The D.C. Pattern Jury Instructions provides the law of defense of a third person:

> Every person has the right to use a reasonable amount of force in defense of another person if (1) s/he actually believes that the other person is in imminent danger of bodily harm and if (2) s/he has reasonable grounds for that belief. The question is not whether looking back on the incident you believe that the use of force was necessary. The question is whether [name of defendant], under the circumstances as they appeared to him/her at the time of the incident, actually believed that the person s/he was seeking to defend was in imminent danger of bodily harm, and could reasonably hold that belief. Defense of another person may be a defense to the charge(s) of [insert all charges to which defense applies].
> …
> [Name of defendant] is not required to prove that s/he acted in the defense of another person. If evidence of defense of another person is present, the government must prove beyond a reasonable doubt that [name of defendant] did not act in the defense of another person. On the other hand, if the government has proved beyond a reasonable doubt that [name of defendant] did not act in defense of another person, along with each other element of the offense, then you must find him/her guilty of the offense of [insert name of offense(s)].

1 Criminal Jury Instructions for DC Instruction 9.510 (2020)

A closer inspection of the evidence demonstrates that Mr. Foy used the appropriate amount of force to defend individuals who were being crushed by advancing police officers. As Mr. Foy approached the area, a man was shouting that someone was "dying" and needed "medical." Just feet away from that man, Mr. Foy could see that the distressed man and saw that he was focused on someone on the ground. Meanwhile, numerous individuals in the immediate vicinity of Mr. Foy pleaded with the officers to "quit pushing people" because "people are getting crushed under here" the officers, audible to the body worn camera. The officers continued to push forward into the crowd pushing them onto individuals who had fallen onto the ground. The tragic and unfortunate result was the death of Rosanne Boyland, the young lady who was crushed under the weight of the individuals on the stairs.

Mr. Foy is alleged to have used non deadly force at a time when Ms. Boyland and others who had fallen to the ground were in imminent harm. Officers were pushing people onto Ms. Boyland and were not responsive to verbal pleas to hold back. For the initial period that Ms. Boyland was on the ground and her friend was calling out for help, Mr. Foy stood back as the police continued to push forward. He then allegedly threw a flagpole at the officers and several seconds later, as blows were exchanged in front of him, he acted in defense of the people who were being crushed by his feet. Though he was pressed against the rail by the weight of others around him, he was within feet of Ms. Boyland and others who could not escape. And unlike other individuals, when space was created, he removed himself from the scene. Exhibit B at 2:55.[4]

To the extent that the government argues that Mr. Foy's actions were excessive, Mr. Foy has been diagnosed with Post-Traumatic Stress Disorder after his service in the Marines. PTSD has long been associated with the trait of hypervigilance. Hypervigilance is "a state of increased alertness" and a main symptom is the overestimation of a perceived threat, leading to reactions that "may be violent or hostile in a perceived attempt to defend yourself." https://www.healthline.com/health/hypervigilance#symptoms (last accessed March 4, 2021). When applying the law of defense of others, the factfinder will be required to consider Mr. Foy's hypervigilance in determining whether his subjective belief that Ms. Boyland and others were in danger of imminent bodily harm.

---

[4] Exhibit B attempts to simultaneously show the footage from the body worn camera (on the right) along with footage uploaded to youtube (on the left) to demonstrate that the man alleged to be Mr. Foy withdrew well before the violence subsided.
https://www.youtube.com/watch?v=Zqh47NQtRPU (last accessed Mar. 10, 2021).

3. The history and characteristics of defendant.

The history and characteristics of defendant weigh heavily in support of release. Mr. Foy has no prior convictions or even arrests reported by Pretrial Services. He served the country for six years, including service overseas. "Our nation has a long tradition of according leniency to veterans in recognition of their service." *Porter v. McCollum,* 558 U.S. 30, 43 (2009).

Although he was unable to find a job in the pandemic after his discharge, Mr. Foy has worked hundreds of hours on a volunteer basis. Specifically, he helped build and maintain bike trails in the City of Detroit and other areas around Michigan. He is described universally by those around him as a "caring and loving" person who has never been known to be violent.

Significantly, Mr. Foy is known in his community to be a protector and a helper. When one family member's house flooded, he showed up unannounced to help. When he was in the military, Mr. Foy was the one known to break up fights and arguments. Even in his adolescence, he would protect the younger kids in the neighborhood. Throughout his life, Mr. Foy would help those in trouble and in need, even if it required him to become physically involved.

4. The Nature and Seriousness of the Danger to Any Person in the Community

Mr. Foy is not a danger to anyone in the community. While he is charged with a serious offense, he used non-deadly force to defend individuals who had fallen to the ground and were being trampled by the advancing police. Mr. Foy's history – almost thirty years of peaceful and law-abiding behavior underscores this. His dedication to this country and the sacrifices he made in joining the Marines further illustrates his non-violent character.

E. The government cannot show that Mr. Foy is a Serious Flight Risk

To the extent that the government argues that Mr. Foy is a serious flight risk, its arguments are conclusory and without factual support. Mr. Foy has very strong ties to his

Michigan community. As demonstrated by the many letters describing his character, he also has their very strong support.

### Conclusion

Wherefore, for the foregoing reasons, the government has not met its burden of demonstrating that there no conditions or combination of conditions that will assure the safety of the community. Mr. Foy respectfully requests that the Court release him.[5]

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

---

[5] Exhibit A and B contain video exhibits. Counsel will await directions how to best deliver the video exhibits to the Court.