```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


 UNITED STATES OF AMERICA,       .
                                 .
            Plaintiff,           .  CR No. 21-0108 (TSC)
                                 .
      v.                         .
                                 .
 MICHAEL JOSEPH FOY,             .  Washington, D.C.
                                 .  Monday, March 15, 2021
            Defendant.           .  1:09 p.m.
 . . . . . . . . . . . . . . . . .
```

                     ARRAIGNMENT/BOND HEARING
             BEFORE THE HONORABLE TANYA S. CHUTKAN
                  UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

```
For the Government:          EMORY V. COLE, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street NW
                             Washington, DC 20530
                             (202) 252-7566


For the Defendant:           EUGENE OHM, AFPD
                             Federal Public Defender Office
                             625 Indiana Avenue NW
                             Suite 550
                             Washington, DC 20004
                             (202) 208-7500


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186
```




Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we have Criminal Action 21-108, United States of America versus Michael Foy.  We have Mr. Emory Cole representing the government and Mr. Eugene Ohm representing Defendant, and all parties are appearing by video.

THE COURT:  All right.  Good afternoon, everyone.

Mr. Ohm, that's a very impressive backdrop you have there.

MR. OHM:  I'm not at home, Your Honor.

THE COURT:  It looks very learned.

(Laughter.)

Mr. Foy, good afternoon.  I'm Judge Chutkan.  Your case has been assigned to me.  Can you hear me?

THE DEFENDANT:  Yes, ma'am.  Good afternoon.

THE COURT:  Good afternoon.

Now, you are the subject of this hearing; so while it's important that everybody be able to hear, it's most important that you be able to hear.  So if at any point during the hearing you lose the connection or something, just raise your hand or otherwise indicate that you can't hear.  So it's important that you be able to hear everything that's going on.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right.  Today's hearing is scheduled to occur via video teleconference due to the ongoing COVID pandemic and pursuant to the CARES Act.

Counsel, Mr. Ohm, Mr. Cole, do you agree to proceed with

1    this hearing by videoconference pursuant to the CARES Act

2    given the current pandemic?  Mr. Ohm.

3                MR. OHM:  Yes, Your Honor.

4                THE COURT:  Oh, my goodness.  Let me stop.  I don't

5    have my mask on.  I'll be right back.  (Pause.)

6         All right.  I'm sorry about that.  There actually isn't

7    anyone else in the courtroom but me, but I like to have it on

8    when I'm in the courtroom.  I was eating lunch and forgot to

9    put it back on.  Sorry about that.

10               THE DEPUTY CLERK:  Judge, real quick, perchance if

11   you need someone from Pretrial Services, we have Mr. John Copes

12   appearing by telephone.  So he's on this call.

13               THE COURT:  Okay.  Thank you.  Thanks for being here.

14        Mr. Ohm, do you have any objection to proceeding by

15   videoconference pursuant to the CARES Act?

16               MR. OHM:  No, Your Honor.

17               THE COURT:  Mr. Cole?

18               MR. COLE:  No, Your Honor.

19        (Unidentified voice on the line.)

20               THE DEPUTY CLERK:  Excuse me.

21        Go ahead, Judge.

22               THE COURT:  All right.  Thank you.

23        (Unidentified voice on the line.)

24               THE COURT:  Whoever is speaking --

25        (Unidentified voice on the line.)

1          MR. OHM:  Hey, Shelli?  Shelli?

2          THE COURT:  Is that Ms. Peterson?  It does sound

3     like Ms. Peterson.  I had her before me this morning.

4          MR. OHM:  I think she's just on the line.  I'll

5     call her.

6          THE COURT:  Going to put her on the record.

7        (Ongoing conversation on the line.)

8          THE COURT:  Let's hope she doesn't start complaining

9     about the judge she was in front of this morning.

10       (Laughter.)

11       (Mr. Ohm placing call.)

12         THE COURT:  But it was an 11(c)(1)(C) sentence, so

13    there should be no complaints.

14       (Laughter.)

15      It seems to have stopped.

16         MR. COLE:  And Mr. Ohm's talking to her right now.

17         LAW CLERK:  Judge, this is Cameron.  I think I was

18    able to mute her remotely.

19         THE COURT:  Okay.  Thank you.  That is my law clerk,

20    Cameron Duncan.

21         MR. OHM:  And just so the Court knows, Ms. Peterson

22    said she's in the middle of a Zoom hearing in a different

23    courtroom, so she doesn't think it's her.  But it sounds like

24    her.  I don't know.

25         THE COURT:  All right  Well, whatever it was it seems

1    to have stopped.

2         So on January 20th of this year, the government filed a

3    criminal complaint, charging Michael Joseph Foy, the defendant

4    in this case, with Knowingly Entering or Remaining in Any

5    Restricted Building or Grounds; Obstruction of Law Enforcement;

6    Forcibly Assaulting, Resisting, Opposing, Impeding, Intimidating,

7    or Interfering with Any Officer of the United States; Aiding and

8    Abetting and Obstructing, Influencing or Impeding Any Official

9    Proceeding of Congress.

10        On February 10, 2021, the government filed an eight-count

11   indictment, charging with Mr. Foy with one count of Civil

12   Disorder; one count of Obstruction of an Official Proceeding

13   and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2);

14   one count of Assault, Resisting, or Impeding Certain Officers

15   Using a Dangerous Weapon; one count of Entering and Remaining

16   in a Restricted Building or Grounds with a Deadly or Dangerous

17   Weapon; one count of Entering and Remaining in a Restricted

18   Building or Grounds; one count of Disorderly and Disruptive

19   Conduct in a Restricted Building; one count of Engaging in

20   Physical Violence in a Restricted Building or Grounds; and one

21   count of an Act of Physical Violence in a Capitol Grounds or

22   Building.

23        Mr. Foy arrived in D.C. on March 9, 2021, from Grady

24   County, Oklahoma, and he is currently detained without bond at

25   the D.C. jail.  There is pending before the Court an emergency

1    bond review motion that Mr. Ohm has filed on behalf of Mr. Foy.

2    Before we proceed on that motion, has Mr. Foy been arraigned?

3              MR. COLE:  No, Your Honor.

4              THE COURT:  Mr. Ohm?

5              MR. OHM:  No, Your Honor.

6              THE COURT:  Then let's proceed.  Mr. Bradley,

7    does the docket indicate whether Mr. Foy was arraigned?

8              THE DEPUTY CLERK:  I thought he was, but I'm

9    checking as we speak.

10             THE COURT:  All right.  Well, I'm going to take

11   his lawyer's word for it.

12             THE DEPUTY CLERK:  Me, too.

13             THE COURT:  Okay.  Mr. Foy, you've been indicted

14   by a grand jury with various felonies, and you have to be

15   formally arraigned on those charges.

16        Mr. Bradley, would you like to conduct the arraignment?

17             THE DEPUTY CLERK:  Yes, I will.

18        Mr. Foy, on February 10, 2021, an indictment was

19   filed against you, charging you with eight counts:

20        Count 1.  Civil Disorder.

21        Count 2.  Obstruction of an Official Proceeding and

22   Aiding and Abetting.

23        Count 3.  Assaulting, Resisting, or Impeding Certain

24   Officers Using a Dangerous Weapon.

25        Count 4.  Entering and Remaining in a Restricted Building

1    or Grounds with a Deadly or Dangerous Weapon.

2        Count 5.  Entering and Remaining in a Restricted Building

3    or Grounds.

4        Count 6.  Disorderly and Destructive Conduct in a

5    Restricted Building or Grounds.

6        Count 7.  Engaging in Physical Violence in a Restricted

7    Building or Grounds.

8        Count 8.  Acts of Physical Violence in the Capitol Grounds

9    or Building.

10        Do you waive formal reading of the indictment, and how do

11    you wish to plea?

12        MR. OHM:  On behalf of Mr. Foy, Your Honor, we waive

13    formal reading of the indictment enter a plea of not guilty to

14    each and every count assert Fifth and Sixth Amendment rights

15    for this and all future proceedings we request a speedy trial

16    we request discovery any *Brady* material under the Due Process

17    Protections Act and under the Constitution.

18        THE COURT:  Okay.  Thank you, Mr. Ohm.

19    Mr. Foy, you have been arraigned on all the charges before

20    me on the charges against you, so we will now proceed to have a

21    hearing on your emergency bond-review motion.

22        I have reviewed the defense's motion for a change in bond

23    conditions.  Mr. Foy's currently held without bond.  I received

24    the government's opposition and the defense reply, all of which

25    I've reviewed.  I've also reviewed two discs containing

1    videotape evidence, one submitted by Mr. Ohm from the defense,

2    one submitted by Mr. Cole for the government.  So that's what

3    I've reviewed in preparation for this hearing as well as the

4    indictment.

5          Pursuant to 18 U.S.C. § 3142, I'm required to release

6    Mr. Foy pending trial unless I determine that no conditions or

7    combination of conditions exist which would reasonably assure

8    his appearance as required or the safety of the community.

9    Short of that, I'm generally required to release him subject to

10   the least restrictive condition or combination of conditions to

11   effect these goals.

12         However, in this case I am to presume that no condition or

13   combination of conditions will reasonably assure his appearance

14   as required and the safety of the community because Mr. Foy has

15   been charged and indicted with a crime of violence.  This

16   presumption operates, at a minimum, to impose a burden of

17   production on the defendant to offer some credible evidence

18   contrary to the statutory presumption.

19         Mr. Foy may rebut this presumption by proffering at least

20   some evidence or basis to conclude that this case falls outside

21   Congress's general factual view by the special flight risks and

22   the special risks of danger to the community presented by

23   defendants who commit certain crimes.  In other words, this

24   places a burden of production on the defendant.

25         However, the burden of persuasion remains with the

1   government throughout the proceeding.  Ultimately, the government

2   must establish by clear and convincing evidence that Mr. Foy is

3   a danger to the community or must establish by a preponderance

4   of the evidence that he poses a risk of flight.

5       However, even if Mr. Foy rebuts the presumption, it remains

6   a factor to be considered among the other factors I must weigh

7   in determining whether pretrial detention is warranted.  These

8   factors set forth in § 3142(g) are the nature and circumstances

9   of the offense charged, including whether the offense is a crime

10  of violence; the weight of the evidence against the defendant;

11  his history and characteristics; and the nature and seriousness

12  of the danger to any person or the community that would be posed

13  by his release.

14      Mr. Foy argues that he is innocent of assault because his

15  actions were legally justifiable and that he saw individuals in

16  imminent danger of bodily harm and used a reasonable amount of

17  force to protect and defend those people who were being

18  trampled.

19      Mr. Foy further argues that, as a veteran diagnosed with

20  mental illness, he is eligible for mental health treatment at

21  the VA treatment center in Battle Creek, Michigan, including a

22  30-day inpatient, mental-health treatment program.

23      All right.  As I said, I have reviewed the papers presented

24  and submitted by both sides.  And I will say as to -- Mr. Ohm,

25  I'll hear you on anything else that you did not address in your

1    very lengthy, very thorough and very comprehensive motion and

2    reply.  Is there anything else you want to add?  And I've viewed

3    the videotape.

4         MR. OHM:  Your Honor, I don't know if the Court also

5    received our supplement that I filed under seal last night?

6         THE COURT:  Yes.

7         MR. OHM:  It was the treatment plan from -- okay.

8    I just wanted to make sure of it.  I'm taking from what the

9    Court is saying that I should be brief, and I will.  But I did

10   want to just point out that, for an individual, I think that

11   the presumption is to be clearly rebutted.  I don't remember if

12   I cited to the cases, but there's case law from this district

13   that says an individual with no priors, an individual with

14   strong ties to the community, and certainly a veteran, that

15   those are factors that would rebut the presumption of detention.

16        And I do think that, you know, when the government is

17   asking for preventative detention for somebody who does not

18   have any history of even being arrested, for somebody who has,

19   I think, at minimum, you could say a cognizable defense in the

20   sense that the government didn't really even put much of an

21   effort to dispute, and a person who has served his country, a

22   person who the government has no reason to say cannot follow

23   any reasonable conditions.

24        And as the Court knows, we're offering Mrs. Hartley, who's

25   on the line, as a third-party custodian.  She lives near the

1    peninsula.  I also did want to point out, Mr. Foy actually did

2    get a job at the end of this.  He was about to start a job for

3    Penske.  But I'm not aware if that job will be available, and

4    because we're proposing Ms. Hartley's residence, that that's

5    going to be far away.

6         Ms. Hartley's residence is in a rural area outside of any

7    -- well, outside of Detroit.  I think that it's a good placement

8    for him.  She is a nurse, and she has -- obviously, has a lot of

9    influence over him and has a lot of understanding about care and

10   also understands the mental health treatment that Mr. Foy is

11   looking for and really needs.  I can also report to the Court

12   that, having spoken to Mr. Foy, he's very anxious about getting

13   the help that he needs.

14        But in the end, Your Honor, this is a question about

15   preventative detention: when is it appropriate or when can the

16   Court take somebody who's only been charged who the Court must

17   still presume innocent and say that that person needs to go to

18   jail, especially when they have no priors.  And I submit that

19   this is definitely not the case.

20        I also noted in our motion, and I do think that it bears

21   mentioning, that the government has started to apply for

22   complex-case designation so that they won't have any sort of

23   time limit.  I think that's important in Mr. Foy's case when,

24   as the Court noted, he was arrested on January 20th.  We're

25   nearly two months in his case, and he just got to Washington,

1    D.C.  So there has been a lack of urgency for this detained

2    individual, a person who's never been detained --

3             THE COURT:  Mr. Ohm, let me stop you a minute.

4    When you say there's been a lack of urgency -- and I'm going

5    to go back and deal with the rest of your argument, but I am one

6    of a number of judges on this court.  We've been getting these

7    cases coming in.  And, yes, they've been coming in slowly for

8    a number of reasons.

9        One is that just about every single individual was arrested

10   outside of this jurisdiction, has to be brought before a judicial

11   officer in their state of arrest; and because of the pandemic,

12   everything has slowed down drastically.  That does not lead to

13   the conclusion -- and I see absolutely no evidence that there is

14   no state of urgency.

15       To the contrary, prosecutors and FBI appear to be working

16   round the clock given the sheer size of this riot and given the

17   sheer number of people involved and the amount of work that's

18   had to go into tracking them down, getting them charged, getting

19   indictments, getting the grand jury to return indictments in the

20   middle of a pandemic.

21       I take exception to your characterizing this as a situation

22   in which there's been no urgency.  I think that for reasons

23   which are out of control of the government, the prosecution of

24   this mass criminal event is taking longer than everybody would

25   like it to.  But it's not due to the government dragging its

1   heels.

2          MR. OHM:  Your Honor, I would just note that I have

3   eight of these cases.  I've gotten -- the first piece of

4   discovery that I received in the eight cases -- and I've had

5   clients charged with these offenses since, I think, January 12.

6   The first piece I got was this Saturday.

7       And so, from my perspective, it's just different.  I'm not

8   trying to blame it on the courts; I'm not trying to blame it on

9   Mr. Cole.  I'm just saying I haven't received any discovery.

10  The only reason that I have any exhibits to present to the Court

11  in this case is because they used those exhibits against

12  Mr. Foy.

13      The only other exhibits or other evidence that I have

14  are things that I found on the internet myself, are pieces of

15  evidence that the government gave to Congress or gave to the

16  media because they wanted to create whatever message that they

17  wanted to create.  And I'm not speaking against that, but I'm

18  saying I haven't had any discovery.

19          THE COURT:  And I understand.  And, Mr. Ohm, I can

20  tell you that I, and I'm sure other of my colleagues, the longer

21  it takes to turn over the discovery, the longer the wheels take

22  to turn in this case, the more differently we'll be viewing or

23  reassessing decisions we've made with regard to detention.

24      But I didn't mean to stop you.  Please continue.

25          MR. OHM:  Sure.  And the point is -- and I know that

1    the transfer between jurisdictions, even without the pandemic,

2    takes a while.  But Mr. Foy spent a good month in the Grady

3    County jail in Oklahoma City without any contact -- without any

4    real --

5              THE COURT:  Wait.  You're freezing.  I've lost sound.

6    Hold on.  Hold on.  Now I can hear you.

7              MR. OHM:  -- it hasn't -- oh, I'm sorry.  I just

8    wanted to point -- I had a month -- Mr. Foy spent a month in

9    Grady County, and during that time I was able to talk to him

10   once on the phone for 30 minutes, with a deputy sitting next

11   to him.  So in terms of my perspective and the work that I

12   generally do for individuals who are charged like Mr. Foy,

13   I have gotten a much later start.

14       Mr. Foy's situation, I think, is different.  I mean the

15   government is asking for detention.  In a lot of these cases,

16   they've brought these charges without being ready to actually

17   start a prosecution.  So that is what I'm referring to when I

18   say, in the end, Mr. Foy has, as everybody else does, has rights

19   and that the seventy-day speedy trial rights is something that

20   I feel like the government has been eyeing in a way that makes

21   me uncomfortable, especially given the history of all of these

22   cases, or at least my personal experience in terms of dealing

23   with individuals charged with these offenses.

24             THE COURT:  I appreciate that.

25             MR. OHM:  But, Your Honor, Mr. Foy -- I think we have

1    put in a plan that the Court cannot -- or the government cannot

2    reasonably dispute is the least restrictive alternative.  And

3    that's what the Court is required to follow, is to find the

4    least restrictive alternative to reasonably assure the safety

5    of the community.  The government has to prove by clear and

6    convincing evidence that that's not the case.

7         Mr. Foy would -- and we are not objecting to any particular

8    conditions if the Court wants to track Mr. Foy, but he would be

9    getting mental health treatment in a residential basis.  He

10   would get -- after that treatment is concluded, he would be

11   getting intensive outpatient treatment, which involves half-a-

12   day sessions for two to three times a week, and he would be

13   living with his mother with whatever conditions that the Court

14   imposes in terms of keeping him at home.

15        Those would be the least restrictive conditions.  I don't

16   think that the government can point to something Mr. Foy would

17   do that would be dangerous based upon his record that those

18   conditions could not address, and certainly not by clear and

19   convincing evidence.

20        I don't want belabor the weight of the evidence

21   [indiscernible] but any questions that the Court might have

22   in this jurisdiction, it's not an affirmative defense.  The

23   government has to prove that at this stage I'm not sure what

24   the burden of proof is, but there is some burden of proof that

25   Mr. Foy's actions were not justifiable.  I think that it's

1   clear from the video that there was bodily harm that was going

2   around all around him, all around his feet at a very -- at an

3   arm's length.

4       And given all of that, Your Honor, I would ask the Court

5   to release Mr. Foy.  The Court can, if the Court is inclined to

6   do so, Ms. Hartley, Mr. Foy's mother, is willing to essentially

7   jump in the car and get here.  We can work with the Court in

8   terms of figuring out a way if the Court feels more comfortable

9   placing Mr. Foy directly in Ms. Hartley's custody, but she is

10  available to the Court if the Court wants to address her

11  directly.  And Ms. Richardson is also on the phone if the Court

12  has any specific questions about the VA treatment plan.

13      One thing that I think might have gotten lost because my

14  pleading was lengthy is that the diagnosis and the medication

15  that Mr. Foy was on he got the week of Christmas.  I believe it

16  was either the 23rd or the 26th.  This event obviously happened

17  within two weeks of that.  I know the Court has had experience

18  with other defendants who have mental health illnesses.  That's

19  also a factor that the Court should consider in terms of

20  assessing future dangerousness.

21      The fact that we are presenting a plan where he would be

22  very closely monitored, treated, and supervised not only by his

23  mother, the nurse, but by the Veterans Administration on an

24  inpatient basis should reasonably assure the Court that Mr. Foy

25  can -- that these least restrictive conditions are sufficient to

1    monitor Mr. Foy.  So I would ask the Court to release him.

2              THE COURT:  All right.  Thank you, Mr. Ohm.

3         Mr. Cole, do you want to respond?

4              MR. COLE:  I do, Your Honor.  Very briefly, I would

5    incorporate by reference the following that the government made

6    in opposition, respectfully.  And I would move into evidence,

7    just for the record's sake, Government's Exhibits 1 through 5,

8    which is the video clips of the defendant, the defendant

9    viciously attacking law enforcement officers.  So those things

10   I wanted to say for the record.  To address just very briefly --

11             THE COURT:  Hold on.  Let me just stop you.

12        Mr. Ohm, do you have any objection to those exhibits being

13   moved into the record?

14             MR. OHM:  No, Your Honor.  But now I wonder if my

15   exhibits [indiscernible].  I thought they were all in the

16   record.

17             THE COURT:  Well, I've looked at them, and I gotta

18   make the finding, so I assume they're in the record.  But if

19   you're moving for your exhibits to be in the record, I'll grant

20   the motion, and they'll be in the record, too.

21             MR. COLE:  I just wanted to make sure, Your Honor.

22   I understood what you had said.  I think the question should

23   be we move them into evidence notwithstanding you've looked

24   at them.

25             THE COURT:  Mr. Cole, you're talking about the one

1    videotape you sent me, right?  The clips are all on there?

2              MR. COLE:  The one CD.

3              THE COURT:  The one disc.  Yes.

4              MR. COLE:  Right.  There were five separate --

5              THE COURT:  Yes.

6              MR. COLE:  And they're marked Government's Exhibits 1,

7    2, 3, 4, 5.

8              THE COURT:  Yes.

9              MR. COLE:  That's what I'm talking about.  And I

10   trust your judgment, Your Honor, when you said you reviewed it.

11   I just think the record -- it was appropriate for me to move

12   them into evidence.

13             THE COURT:  That's fine.

14             MR. COLE:  I wanted to just highlight a couple of

15   points, Your Honor, very briefly, in this matter.  I think

16   Mr. Ohm is mistaken with a couple of matters.  That the defendant

17   was legally justified to be there, that's just a perversion of

18   the facts.

19             THE COURT:  Well, that goes to the merits.

20   Does he have a defense?  He may have a defense.

21             MR. COLE:  But that's what's wrong, Your Honor.

22             THE COURT:  Just like a murder case.  You may have a

23   self-defense to murder.  Still doesn't -- the fact that you have

24   a defense doesn't necessitate not releasing you just because you

25   have a defense.  But I understand --

1          MR. COLE:  No, Your Honor --

2          THE COURT: -- Mr. Ohm's point being that he may have

3    a plausible defense of defense of others to his actions, and I

4    should take that into consideration.  Are you disagreeing?

5          MR. COLE:  Yes, Your Honor, at this time.  This is a

6    detention hearing, not a trial or a pretrial motion.  It might

7    be a defense for a pretrial motion because, one, the defendant

8    cannot be doing illegal acts and have a legal defense.

9          THE COURT:  Right.  I agree with you.  But the

10   decision, Mr. Cole, as to whether defendant was committing

11   illegal acts will be ultimately for the jury to find.  Are you

12   telling me --

13         MR. COLE:  No, Your Honor --

14         THE COURT:  Wait, wait.  Hold on.  You and I have

15   done, you know, major felonies when I was a defense attorney

16   and you were a prosecutor, and certainly there were clients on

17   murder charges who were released because of the strength of

18   their self-defense which a jury had to rule on ultimately; but

19   at the preliminary hearing or the detention hearing, the judge

20   can say, well, looks like he's got a strong self-defense claim

21   here, he's got no record, so -- I'm not saying that's what I'm

22   going to do in this case, but I don't agree with you that the

23   existence of a potential defense, whether I regard it as a

24   viable one or not, is a factor I can consider.

25         MR. COLE:  No.  I understand that, Your Honor, and I'm

1    not disagreeing with the Court.  Let me --

2              THE COURT:  But I understand your position is --

3              MR. COLE:  Let me highlight something, Your Honor.

4              THE COURT:  Okay.

5              MR. COLE:  When I said that he was illegally there --

6    for example, one of the counts is the defendant entered and

7    remained in the Capitol building.  That is illegal.  He should

8    not have been there.  My brief statement was, while he was on

9    the restricted area of the grounds and inside the building, he

10   was committing a criminal act in and of itself.  You can't be

11   legally justified while you are committing -- while you were

12   there helping someone else.

13             THE COURT:  All right.  I don't need to make that

14   finding to determine whether to hold him without bond.  I don't

15   need to make a finding as to whether what he was doing was legal

16   or illegal.  He's been charged.  He's been indicted.  I've

17   viewed the evidence against him, or some of it, and I don't need

18   to rule on the ultimate issue of the legality of his conduct to

19   determine that there's probable cause, no doubt about it.

20             MR. COLE:  All right.  That's fine, Your Honor.

21   I think the strongest point I wanted to make is, it's almost

22   like as if someone went into a bank and knocked over a customer;

23   they picked up the customer and helped them up and they should

24   get some type of mitigation for the actual act.

25        The act of the defendant being on the Capitol grounds was

1   an illegal act.  He had no right to be on the Capitol grounds,

2   nor did he have a right to be inside of the Capitol grounds,

3   period.  He wouldn't have been in that position to aid a --

4   quote-unquote, help and aid anyone.  He's not a modern-day hero.

5   He is charged with very serious crimes.

6          Having said that, Your Honor, I just want to move on to

7   two different additional points.  One of the things that defense

8   counsel said is that, in essence, you can trust this defendant

9   now, and I submit to you that there is no way that you can trust

10   this defendant when the actions that we showed you on Government's

11   Exhibit No. 1 and 2, he takes that hockey stick which we have

12   deemed -- the facts will deem to be a dangerous weapon, and he

13   strikes it multiple times at the head, neck, face, and shoulder

14   areas of law enforcement officers, men and women who are

15   protecting our seat of democracy.

16          And those men and women had family members -- husbands,

17   wives, children -- that they wanted them to come home.  The

18   defendant, had he not been there, he could have turned around

19   at any time and not been at the Capitol.  But what did he do?

20   He did it so with glee and exuberance in his vicious attack on

21   law enforcement.

22          More importantly, as a former military officer who was

23   sworn to protect the Constitution, what did he do?  He attempted

24   to destroy the Constitution in our seat of democracy, without

25   any hesitation.  And you would have to ask yourself, was this

the first time he did something similar to this?  Can you
trust it?  On November 6, the last photograph in our motion,
the defendant was protesting the lawful presidential election of
2020 outside of the Michigan statehouse, where he's protesting
the lawful counting of ballots in Michigan.  So this is not his
first time where he leaves his home and he comes to a location
to protest, quote-unquote, an unlawful election.

So the fact that he swore an oath to the Constitution
to defend and protect -- and those men and women that he was
attacking, as the government has outlined in numerous filings,
were heroes that day.  But for them and the law enforcement
officers, who knows, the vice president of the United States and
other congressmen and women were inside that building along with
support staff, and the defendant was trying to do that.

I note, finally, that when defendant was striking at those
law enforcement officers, he wasn't striking a brick or a wall
or a window.  It was our democracy.  And because of that, and
because of the area he was in and what he did, the defendant
took glee in his action, and he had a nature that he wanted to
inflict, I would submit to you, more disruption.

The second-to-last photograph that we include in our motion
is from the defendant's telephone.  He took a picture, once he
was inside, of the sheer destruction that happened in the
Capitol.

With that, Your Honor, I'm not going to belabor any points.

I think you can ask in your calculus, one, could the defendant have turned around and left?  The answer is yes.  At the first photograph we showed, he was standing underneath the scaffolding.  He could have left and moved on about his way, no officer attacked.

Once he first attacked the officer and saw others attack them, could he have walked away?  Yes, he could have.  But he continued.  Once he finished attacking the officer, could he have left and not entered the building?  The question and answer is, he entered the building and took photographs of his destruction.

And lastly, it was only through the law enforcement efforts, the same law enforcement of democracy that he attacked, that he sits there before you now saying that he was lawfully justified to help somebody else beat up more officers and bring them and their families in disruption.

I would note -- last sentence, Your Honor.  There were over a hundred men and women in law enforcement who were injured and hurt, and five people, law enforcement people and others, were killed.  It is this type of disruption to our democracy and what he did and he encouraged others to do, based on our videos and photographs that we have mentioned, that we respectfully ask that there are no conditions that this defendant, one, is a danger to the community -- a danger if he's released.

But more important than that, this particular defendant

1    stands out.  He's an outlier.  Based on the sheer viciousness

2    and the sustained attacks he did on law enforcement, he is

3    indeed a clear and present danger if he's released.

4         More importantly, he knows that if he's released, the

5    likelihood of him coming back is remote because he has access

6    to individuals, as Mr. Ohm has mentioned, in the upper part of

7    Michigan and live in rural areas, and he knows he's facing a

8    very large and significant time period of incarceration.

9         And in this particular case, the defendant's base actions

10   are on video, photographs.  Mr. Ohm has those to conduct

11   whatever investigation he wants to start, and we'll get the

12   discovery to him consistent with our procedures that we're

13   establishing.

14             THE COURT:  Mr. Cole, where exactly was Mr. Foy

15   arrested?  How did he come to be presented before an Oklahoma

16   judicial officer?

17             MR. COLE:  Oh, no, Your Honor.  He was arrested in

18   Michigan.  I'm happy you asked that question.  What happened,

19   I believe, and I'm almost certain, the U.S. Marshals have a

20   transport hub in Oklahoma.  As a matter of fact, I know that.

21   I have another defendant who came from Ohio or Pennsylvania, and

22   he went to Oklahoma.  That's their transport hub, Your Honor.

23             THE COURT:  Okay.

24             MR. COLE:  So it was the marshals.

25             THE COURT:  That's my question.

1          Okay.  I'm going to go over the factors, but not

2     necessarily in the same order I listed them.

3          Mr. Foy is a veteran of the United States Marine Corps.

4     He served from 2015 till 2020, when he was honorably discharged.

5     He served overseas in Okinawa from 2015 to 2017, and on-base

6     in North Carolina till last year.  He had been diagnosed with

7     an unspecified anxiety disorder and major depressive disorder

8     and posttraumatic stress disorder, and I understand he has

9     undergone some hardships since his discharge.

10         I take service to the military seriously and factor

11    it heavily in determining not just detention but sentencing.

12    You know, I give a lot of credit to people who serve their

13    country.  But as Mr. Cole points out, Mr. Foy took an oath

14    to protect and defend the Constitution.

15         And not only is he charged with undertaking acts to

16    undermine the Constitution and overthrow the lawfully elected

17    government and invalidate lawfully elected election results,

18    he took those acts despite his oath as a military officer to

19    protect and defend the Constitution.

20         I think Mr. Ohm's argument with regard to Mr. Foy's prior

21    service are well taken, but are definitely undermined by his

22    actions, not only on the day of the insurrection, but on his

23    prior demonstration -- and I want to be clear, Mr. Cole and

24    Mr. Ohm.  One of the beautiful things about this country and

25    about our democracy is the right to have unpopular opinions,

the right to speak unpopular opinions, the right to say
whatever you want that may not be widely accepted or viewed
as acceptable; but it's the freedom that we all enjoy in this
country.

I'm on the receiving end of it all the time.  I get lots
of letters and emails that say very unpleasant things about me.
And I think: What a great country we live in where people have
the freedom to say that without worrying that someone's going
to knock on their door and haul them off to jail.  So I am not
going to factor Mr. Foy's presence at a political rally where
he's protesting, and he's legally protesting, I'm not going to
use that as a factor to hold against him.

But I take Mr. Cole's point that his presence at a protest
rally against the lawful -- widely accepted as the lawful
 election results in this country indicate that this wasn't
some spur-of-the-moment action he took to be here on January 6.
So I take Mr. Cole's point in that regard.  But if I decide to
hold Mr. Foy without bond, I'm not holding him because he went
to a previous rally, which is his legal right.  I'm holding him
because his presence undermines any inference that this was an
impulsive, spur-of-the-moment act.

Similarly, Mr. Foy's history of mental illness and his
diagnosis are also something that concern me and factor into my
view of his behavior.  But, again, there is no allegation here,
nor is there any evidence here, that Mr. Foy acted the way he

did because he was having some kind of a psychotic break or suffering some delusional behavior because of his mental illness.  To the contrary.

Mr. Ohm suggests and argues that Mr. Foy's actions here were legal because he was coming to the defense of someone else or of other individuals, which certainly indicates an argument that Mr. Foy was acting rationally and reasonably.  Again, that's for the jury to decide.  But there is no evidence that Mr. Foy's mental illness played any role in causing him to take the actions that he did, and I don't see any basis to find that.

Finally, with regard to the nature and circumstances of the offense charged, I don't think it possible to overstate the seriousness and the enormity of what was a mass, violent riot at our Capitol on January 6.

The police, by all accounts, and even in the evidence provided by both sides, were vastly outnumbered.  The video footage of the police mustering in the tunnels below the Capitol and getting ready to go out and confront what must have been a terrifying, violent mob was just really, really awful.

And it is to the credit of our law enforcement officers that, knowing what they were facing, knowing the fact that they were outnumbered, and knowing that the crowds were basically screaming for blood, that they went out there.  And I do not like to imagine what could have happened if this riot had not been stopped.

If somehow law enforcement had not been able to diffuse the situation and get the protesters -- and I don't call these "protesters" -- rioters who were screaming to hang the vice president and roaming the Capitol in search of the Speaker of the House, what would have happened if they had not been dispersed.  I don't like to imagine it.

It could have been really very, very bloody and very violent, and there could have been enormous losses of life, to say nothing of the threat to our rule of law and our electoral system and our democracy.  I'm not generally given to hyperbole about crimes, but this one was horrifying.

The government has charged Mr. Foy with, among other things, violently using a hockey stick to assault and interfere with an officer of the United States while such officer was engaged in official duties.  The government alleges that Mr. Foy took such action while trying to break through the line of officers protecting the lower West Terrace entrance to the Capitol, and Mr. Foy's attack was persistent and unrelenting.

The defense attests that Mr. Foy was attempting to protect a woman from imminent bodily harm.  The woman had fallen on the step and was being crushed as officers pushed protesters back away from the doors of the tunnel entrance.

The government also alleges that Mr. Foy subsequently entered the Capitol through a broken window, encouraged others to likewise break into the Capitol, and carried his hockey stick

with him into the building.  Mr. Foy went to the January 6

protest alone after deciding to attend at the last minute.

The defense further notes that Mr. Foy wasn't wearing

tactical gear, did not promote or celebrate efforts to disrupt

the election, and did not brag about the events and did not

discard or tamper with evidence after the fact.

There is a great deal of video evidence from multiple

sources.  There is also evidence in the form of a photograph

found on Mr. Foy's phone which was recovered.  The photograph

shows rioters and debris standing inside the Capitol.  I have

reviewed the evidence submitted in this case.

Mr. Ohm, I have to tell you that, having reviewed the

video material that you submitted, I cannot agree with your

interpretation of events.  I watched all of the material.  It

is true that at some point Mr. Foy or someone else is yelling,

she's being crushed, or there's a woman down, she's dead, she's

hurt.  But I watched the actions, not just listened to the

words.

Mr. Foy is seen on the videotape actively, violently, and

repeatedly swinging his hockey stick at officers, Metropolitan

Police Department officers and other law enforcement officers,

before any woman went down.  And after the woman is apparently

rescued, Mr. Foy turns on the law enforcement officers, screaming

and cursing at them, and turns his rage on the officers.

This does not appear to me to be a simple case of Mr. Foy

being on the scene and trying to be a Good Samaritan, helping
out a woman who had fallen.  This appears to this viewer of the
videotape to be an individual who's taking part in violence
against the police, attempts to try and draw officers' attention
to the fact that there's a woman down, and then continues in his
violent assault and rage against the officers after the situation
with the woman seems to have been resolved.

So this is not a simple situation of I just happened to
be there and I'm trying to hold off the officers with my hockey
stick while she can get help.  That is not how this Court viewed
that evidence.  The evidence that I viewed is violent and
horrifying.

And that hockey stick -- which by the way, I know in the
defense pleadings you say Mr. Foy grabbed the hockey stick when
he left and intended to use it as some kind of flagpole, and I
have to tell you that I just cannot join in that interpretation
of what that hockey stick was doing in Mr. Foy's hand.  There
is no hockey rink at the Capitol.  Mr. Foy grabbed that hockey
stick when he decided to drive to the Capitol, and there is no
doubt in this Court's mind that he brought this hockey stick to
use as a weapon, not as a flag.

And by the way, there were many flags and flagpoles there
being used as weapons against officers of the United States.
There were crutches.  There were batons.  There were any manner
of dangerous instruments that could have killed an officer.

1    And I would just remind you of the officers who were in fact

2    killed that day and officers who had heart attacks and officers

3    who had their eyes gouged out and officers who will never be

4    coming home to their families.  So I take issue with the defense's

5    description of Mr. Foy's actions as simply actions of somebody

6    who was trying to help somebody else who had fallen.

7        Moreover, Mr. Foy wasn't there by accident.  He didn't

8    wander onto the Capitol grounds mistakenly.  He got in his car

9    and he drove from Michigan to the District of Columbia with an

10   intention to participate in this insurrection.  He could have

11   stopped at any point.  He could have walked away when he got to

12   the Capitol grounds.  He could have walked away on the steps.

13   He could have walked away on the West Terrace.

14       When the crowds stormed Congress and broke into the Capitol,

15   and Vice President Pence was inside the building and people were

16   shouting about what they wanted to do to him, Mr. Foy could have

17   left.  After the woman was rescued or assistance was rendered,

18   Mr. Foy could have left.  He did not.

19       He proceeded into the Capitol where windows had been

20   smashed, where a woman had been shot trying to get into the

21   building, where disorder reigned and where congress people were

22   cowering in terror.  And he went into the Capitol, he took a

23   photograph of the destruction he and his fellow rioters had

24   wrought, and then he went home.  He did not turn himself in

25   immediately after.  He was arrested by the police sometime

1   later.

2        So, Mr. Ohm, I cannot join you in your assessment of the

3   evidence that I've seen.  The evidence that I've seen is truly

4   horrifying and paints a very violent, rage-filled picture of

5   what was going on that day.  And nowhere in the videotape and

6   photographs that I saw did it appear that -- in fact, I should

7   say it appears clearly from the evidence that I looked at that

8   Mr. Foy was determined to inflict violence on law enforcement.

9        He wasn't trying to just help a woman who had fallen.

10  He was angry and rage-filled at law enforcement.  This man,

11  who took an oath to protect and defend the Constitution of the

12  United States, did his very best to do just the opposite on that

13  day, with violence.  And he is very fortunate that no one was

14  killed.  I do take into consideration that the fact that Mr. Foy

15  has no prior criminal record and no prior criminal history or

16  violent history that I am aware of.

17       And again, I mentioned I take into consideration his prior

18  military service, but that military service has to be viewed in

19  light of Mr. Foy's unwillingness to follow lawful orders of law

20  enforcement that day.  This military man, who knows the chain of

21  command, who's supposed to be respecting the Constitution and is

22  supposed to be respecting other law enforcement officers, not

23  only disregarded their commands but tried to hurt them, and very

24  well could have killed one of them.  So I have to take that into

25  consideration in deciding whether he is likely to respect

1    conditions of release and respect orders from this Court.

2         Given all the evidence that I've discussed, given -- and

3    I'll say this:  I have a lot of these cases, and I'm probably

4    going to get more, like all the other judges on this court.

5    Mr. Foy is the only case I have had so far in which the defendant

6    has been detained.  And so this is not, I think, a knee-jerk

7    detention request by the government and a knee-jerk decision.

8    This case is different from the other cases that I have seen in

9    which defendants have been released, because this case involves

10   a very, very high degree of dangerous violence.

11        I find that Mr. Foy has failed to overcome the presumption

12   that no condition or combination of conditions will reasonably

13   assure his appearance as required and the safety of the community.

14   I do so not just because of the very violent nature of the act

15   that he is charged with, but the fact that he committed this act

16   after getting in his car and driving for hours and hours to the

17   District of Columbia, the fact that after engaging in violent,

18   basically hand-to-weapon combat with D.C. law enforcement

19   officers, he continued on into the Capitol and took photographs

20   of the destruction that he and his co-rioters had wrought.

21        I find that the government has established by clear and

22   convincing evidence that Mr. Foy is a danger to the community.

23   Therefore, Mr. Foy's motion for pretrial release is denied,

24   and Mr. Foy shall remain in custody pending trial without bail.

25        Mr. Cole, I take Mr. Ohm's assertions regarding the pace

of discovery in this case seriously.  While I am denying the

defense motion for release pending trial at this point, I can

tell you that if discovery continues to trickle in, if the pace

continues to be very slow, Mr. Foy is an individual defendant

who has been charged individually and has all the constitutional

protections that are afforded a defendant in a case, including

speedy trial rights.  I will revisit my detention decision if

this case continues to drag on.

So I understand what the government is doing here.  I

understand this is a mass-crime event and there are efforts

to coordinate production of discovery and protective orders

and to send discovery out, but I have to view each case

individually.

But Mr. Foy is different from the other defendants that I

have before me because he is detained.  Therefore, his speedy

trial rights are paramount, and should the case continue to drag

on, I will have to revisit my detention decision.  So I caution

you on that in that regard and just want to warn you that this

decision is subject to revisiting if the case is not prosecuted

as promptly as possible.

We need to set a status date?

MR. OHM:  Your Honor, if I may say one thing.

In terms of for the Court's information in case we do end

up talking about detention again, and because the Court said

something about Mr. Foy screaming or cursing at the officers,

and I know that other people have misidentified Mr. Foy because there was another person with a big "M" on his shirt who was screaming at the officers, and I don't believe there's any video that captures Mr. Foy saying anything.

So I just wanted to make clear that the portion that I think it's undisputed that on Exhibit A that Mr. Foy was even sort of in that area before he left was between 5 minutes and 17 seconds and 5 minutes and 54 seconds, he left long before a lot of the screaming happened.  Even I think in our exhibit where one of the persons is saying, you know, you effing killed a girl, at that point he had already gone.  So I just wanted to make sure -- didn't sound like that's what the decision of the Court turned on --

THE COURT:  It's not based on what he said.  My decision is based on what Mr. Foy did.  And it's very hard not to see that hockey stick coming down again and again on those law enforcement officers.  And again, I'm taking pains here to separate what Mr. Foy -- what Mr. Foy believed or didn't believe or his political philosophy or his feelings towards law enforcement, that is not why he's being held.  He's being held because of his actions.

And, you know, that hockey stick was no flag.  That was a weapon, and it was being used as such.  And that is what I'm basing my decision on.  But I take your point with regard to my interpretation of the videotape.

1          MR. COLE:  Your Honor -- oh, I'm sorry.  Go ahead,

2    Mr. Ohm.

3          MR. OHM:   Thank you.  I was going to ask Your Honor,

4    given -- my understanding is that we are essentially -- our

5    offices have been discussing for over two weeks now the

6    potential of a protective order that everybody could sort of

7    join into.  My view, especially with Mr. Foy being incarcerated

8    now, is that we're about at a standstill.

9        So I would ask that the Court just set a briefing -- unless

10   the government is intending to provide discovery at least of the

11   -- I put the internal Capitol footage in a different category;

12   I think there's stronger arguments that the government has for

13   that.  But everything else I don't think should be subject to a

14   protective order.  Unless the government agrees with my position,

15   I would suggest that we just set a briefing schedule for the

16   protective-order issue so that we're not just sort of sitting

17   back on this.

18          THE COURT:  That's fine with me if you all want to

19   propose dates.  Mr. Cole?

20          MR. COLE:  Your Honor, can I be heard just one moment?

21          THE COURT:  Sure.

22          MR. COLE:  You are aware our office is trying to do a

23   holistic approach as Mr. Ohm has just said.  Our office is in

24   discussion with their office to get an agreed-upon protective

25   order and moving forward.

As it relates to discovery, we have a holistic office, discovery-wide mechanism going on right now.  I heard what you said, Your Honor, and I will take that to the discovery protective-order group so that they will hear it directly from me your concern regarding that in detail.  And I have -- as you can probably imagine, I have several defendants that, based on my tenure here, are held.  Almost all of them are held.  So this is not the first time I've had this particular discussion.

I just wanted to make one correction, Your Honor.  This case was not -- you mentioned that it had dragged along, this case.  What had happened, and I think what you know, is that the U.S. Marshals have been tasked with bringing all over the country.  And as I've just noted to the Court, Oklahoma was their hub.  And when they get enough people, I assume, they move them to D.C. or wherever, because I believe that's their hub for the whole nation, depending on what crimes a defendant may have.  So to the extent that the U.S. Attorney's Office and the DOJ, we haven't drug out, nor has the U.S. Marshals Service, given the volume --

THE COURT:  Oh, Mr. Cole.  I'm going to stop you because I am in no way implying that.

MR. COLE:  Oh, okay.

THE COURT:  The U.S. Marshals Service, for which I'm a big fan, has been working overtime.  Everybody's been working hard.  Everybody's been working hard.  The defenders' offices

have been working hard.  This is an unprecedented crime involving all kind of internet footage and phone footage and tracking people down from all over the country.  I'm not blaming anybody.  Everybody's working as hard as they can.  That being said, it's still taking a long time, and I have to view each case individually.

MR. COLE:  Yes, Your Honor.  I just took a concern with the word "drag."  That's all.

THE COURT:  No, no.  I'm not implying that anybody is deliberating being slow or anybody's being lazy or not doing their job.  This case is going to take -- it's very complex.

MR. COLE:  Yes, Your Honor.  So that's all I have, and I thank you for hearing me out.

THE COURT:  All right.

Mr. Ohm, you asked for -- you said a briefing schedule on the protective order.  I'm not quite sure what you mean.

MR. OHM:  Well, Your Honor, if the government's going to move for a protective order, a protective order is an exception of the rule under Rule 16.

THE COURT:  Right.

MR. OHM:  So if the government's going to move for one, I would ask that they do so in the next week or so, that we have an opportunity to respond a week after that.

THE COURT:  Is that apart from any protective order that they negotiate with your office?  I mean, I'm not -- what

I'm hearing in other cases is that there's some effort underway between the U.S. Attorney's Office and the Federal Defender's Office to come up with a global protective order.  Are you talking about something else?

MR. OHM:  That's been going on for a couple of weeks, Your Honor.  I guess what I'm saying is that, on behalf of Mr. Foy, who's detained, we don't -- and we have -- from the beginning it has been made clear that we don't need to opt into whatever the negotiations the offices are trying to come up with.  I think it makes a lot of sense here if there's a released individual to wait until all of this happens, but he's sitting in jail.

THE COURT:  Okay.  Mr. Cole, regardless of what -- Mr. Ohm makes a fair point.  Regardless of what negotiations are going on between your office and the Federal Defender's Office, Mr. Ohm's point is a valid one, that Mr. Foy is sitting in the jail and he's being charged as an individual.

So, despite whatever global negotiations are going on, you should get Mr. Ohm whatever discovery you can get him as soon as possible, and if you need to ask for a protective order in order to turn over that discovery, again, regardless of what is going on on a global scale, then you should request that protective order as soon as possible.  I don't want that to be a reason for why Mr. Ohm hasn't gotten discovery.  Do you understand?

MR. COLE:  No, Your Honor, I understand.  I don't have

a problem of what I think the general discovery items that we

can give if Mr. Ohm cannot enter into a protective order with me

and it's against the orders of his office.  So he can -- the

protective order that we would have, if it came to that, would

encompass one, and Mr. Ohm has objected to original protective

orders we've had for our body-worn camera videos.

THE COURT:  All right.  But every case --

MR. COLE:  So he cannot --

THE COURT:  Hold on.

MR. COLE:  -- [indiscernible] his office.

THE COURT:  Well, no, no, no.  Mr. Ohm has one client

in this case.  Just like the U.S. Attorney's Office takes

different positions in different cases, Mr. Ohm's position is --

his duty in this case is to Mr. Foy.  Therefore, regardless of

what the Federal Defender may be doing, they can't bind Mr. Ohm

and Mr. Foy, because it's a separate case.

All I'm saying is, it may be that Mr. Ohm joins in whatever

global protective order, but for now, if he requests discovery

for his client and you need a protective order in order to turn

over that discovery, you should ask for a protective order.

MR. COLE:  Yes, Your Honor.  There is a protective

order that certain other counsel not involving Mr. Ohm's office

have agreed to sign off on.  So I can find that and send that

to Mr. Ohm and see if he will now agree to that with this case.

So it's no problem.

1          THE COURT:  Why don't you all try and work that out.

2     If you cannot come to an agreement, then you can come back to

3     me.  Let's set another status date.

4          MR. COLE:  Your Honor, could we have a status date,

5     respectfully, 30 days?  I know Mr. Ohm said something about a

6     week, but that's just not -- that is not appropriate, I don't

7     believe.  I would say 30 days we will know better.  Maybe we'll

8     have reached an agreement with their office, or not, but I can

9     surely find the one that other defense counsel have agreed to.

10         THE COURT:  Well, what I want to impress upon you,

11    Mr. Cole, is the importance of getting discovery to Mr. Ohm as

12    soon as possible, independent of when our status hearing is.

13         MR. COLE:  Yes, Your Honor.

14         THE COURT:  Mr. Ohm, do you have any objection

15    to 30 days?

16         MR. OHM:  Your Honor, I would ask for 14 days.

17    But let me just say this.  If I'm going to -- we're going to

18    oppose any exclusion, and so I don't know if that helps guide

19    the Court.  Until we get discovery, I think we're going to be

20    opposing exclusion since Mr. Foy has been held since January 20.

21         MR. COLE:  Your Honor, if Mr. Ohm is going to oppose

22    the exclusion of time then, then why are we even waiting for the

23    discovery?  Because how can he be an effective attorney without

24    the discovery?

25         THE COURT:  Oh, now, Mr. Cole.  Mr. Ohm won't question

1   you doing your job, and I won't have you question him doing his

2   job.  He's asserting his --

3            MR. COLE:  No.  I wasn't --

4            THE COURT:  There's a Speedy Trial Act.  If he thinks

5   it's in his client's best interest to oppose exclusion of time

6   under the Speedy Trial Act, it's Mr. Foy's right to do that.

7   You may wonder how he can do that and still be ready for the

8   trial he's asking for, but it is a strategic decision that many

9   lawyers do for their clients.

10           MR. COLE:  All right, Your Honor.  To the extent that,

11  one, I've never had an issue before you or anyone in the court

12  with my discovery practice and procedures -- and this will not

13  be the first case, I assure you.  This will not be the first.

14  You've never had -- we've talked more about discovery in this

15  case than all the cases I've had before you.

16           THE COURT:  Okay.  All right.  Let's set a date.

17  Mr. Ohm has asked for two weeks.  You've asked for 30 days.

18  Let's split the difference.  How about Wednesday, April 7?

19           MR. COLE:  Your Honor, can I say something?  On

20  that date, could it be that Friday?  I'm mentoring another

21  AUSA on a trial before Judge Cooper that starts jury selection

22  April 6th in the federal courthouse.  So I'm with that trial --

23           THE COURT:  It's supposed to start the 6th?

24           MR. COLE:  Yes, Your Honor.  It was supposed to be

25  the 5th, but for some reason it was changed.

1          THE COURT:  Well, can we do the status the 5th, then?

2     That's Easter Monday.  Is that doable?  Because if you're going

3     to be mentoring somebody who's starting a trial on the 6th,

4     you're going to be busy for the rest of the week and probably

5     the next week.

6          MR. COLE:  No, I'll be able to do it.  I was just

7     thinking that we'd be finished that Friday, would probably be

8     better.  That gives a couple more days.

9          THE COURT:  I can do it that Friday.  How about Friday

10    -- so we're talking Friday the 9th.  Can we do it at -- well,

11    I have a matter at 10:00 and a matter of 11:00.  The matter at

12    11:00 is a -- if it's just a status, can we do it at 10:30?

13         MR. COLE:  I'm available, Your Honor.  Thank you.

14         THE COURT:  Mr. Ohm?

15         MR. OHM:  Your Honor, can we do it at 11:00?

16    I currently have a sentence scheduled at 10:00.

17         THE COURT:  I have a status at 11:00.  It might be

18    converted to a plea; it hasn't right now.  How about noon?

19         MR. OHM:  That's fine, Your Honor.

20         MR. COLE:  All right.  That's fine, Your Honor.

21         THE COURT:  Okay.  Noon.

22         THE DEPUTY CLERK:  Judge, that's 12:30, Your Honor,

23    because we have to --

24         THE COURT:  Oh, 12:30.

25         THE DEPUTY CLERK:  It has to be 12:30.

1          THE COURT:  Okay.  April 9th, 12:30.

2     Okay.  Mr. Cole, I assume you're asking for an exclusion

3  of time, and Mr. Ohm, I'm assuming you are objecting to that.

4  Is that right?

5          MR. OHM:  That's correct, Your Honor.  Mr. Foy's been

6  before -- he's been charged since January 20th, detained in that

7  time.  And I know that there are other circumstances that affect

8  things, but given the fact that --

9          THE COURT:  I'm not going to rule on that request at

10 this moment.  I just need to examine the factors, and I'll issue

11 a ruling in a minute order.

12         MR. OHM:  Yes, Your Honor.  I just -- I do want to

13 point out, you know, that I think that there has been a lot

14 of excluding of time for the purposes of getting discovery to

15 the defense lawyers in these cases, and now it's all of a sudden

16 this protective order that's holding things up.  And I think

17 there are a lot of lawyers who sort of feel like they had the

18 wool pulled over their eyes by these different moving targets.

19    So at this point, Your Honor, we're just anxious to get

20 going on this case.  There is no standing order anymore, and

21 Mr. Foy is obviously entitled to his speedy trial.

22         THE COURT:  All right.  Because Mr. Foy is detained

23 and there are some time issues that I have to consider, I'll

24 issue a decision by a minute order.  I just have to consider

25 the factors in a little more depth.  There's usually a joint

1   request; so where there's an objection, I'm going to consider

2   it carefully.

3        MR. COLE:  Your Honor, on that issue I just want to

4   make it clear.  I understand the Court's decisions regarding

5   discovery in this matter and protective order, but as it relates

6   to the government's request now that you exclude the time with

7   one sentence is that [indiscernible] that we are talking about

8   generally, if it isn't, we are in negotiations from one office

9   to another.  And I understand the individuality of this

10  particular case, and we will work on it.  But based on that,

11  I would ask you to find that time should be tolled from the

12  speedy trial clock from today until the next date.

13       THE COURT:  All right.  I'll take that request under

14  consideration, Mr. Cole.

15       MR. OHM:  If I could add one other factor for

16  Your Honor, I just wanted the Court to know, other than the

17  Statement of Facts, I have not a single piece of paper from

18  the government, not a single police report, not anything from

19  Mr. Foy's phone.  That was the first I actually just saw of

20  it, when the government filed their motion.  They indicted

21  this case two weeks ago, so they must have some stuff in

22  their file.  I have none.

23       THE COURT:  All right.

24       MR. OHM:  So to the extent the protective order

25  is the excuse, I think that -- I don't think that that can

 1  be something that can [indiscernible.]

 2          THE COURT:  All right.

 3      Well, Mr. Cole?

 4          MR. COLE:  Yes, Your Honor.

 5          THE COURT:  Try and turn over whatever you've got.

 6          MR. COLE:  I hear you, and I'm going to take that

 7  to all the people that need to know that it came from you.

 8          THE COURT:  You do that.  I will see you all on

 9  the 9th.  Thank you.

10          MR. COLE:  All right.  Take care.

11          MR. OHM:  Thank you.

12      (Proceedings adjourned at 2:17 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

* CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


_____
BRYAN A. WAYNE

* PLEASE NOTE:

This hearing was taken via videoconference in compliance with U.S. District Court Standing Order 20-19 during the COVID-19 pandemic.  Transcript accuracy may be affected by limitations associated with use of electronic technology including but not limited to signal strength, background noise, or any other sound distortions.