**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 21-CR-108 (TSC)** |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL JOSEPH FOY,** | : | |
| | : | |
| **Defendant.** | : | |

---

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OBSTRUCTION CHARGE**

---

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits that this Court should deny Foy's motion, ECF 71, seeking dismissal of Count Two of the pending Indictment. Count Two charges Foy with obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2. In his motion, Foy asserts that the conduct alleged in Count Two – *i.e.*, his corrupt obstruction, influencing, and impeding of Congress's certification of the Electoral College vote on January 6, 2021 – falls outside the scope of Section 1512(c)(2), because his action was not related to a document, record, or other object.   Foy further asserts the certification of the electoral vote was not an "official proceeding."   Finally, Foy asserts that that Section 1512(c)(2) is unconstitutionally vague.

Foy's contentions lack merit. Most judges in this District have rejected the challenges that defendant raises in his motion. *See, e.g.*, *United States v. Sandoval*, 21-cr-195 (D.D.C. June 6, 2022) (Hogan, J.); *United States v. Herrera*, 21-cr-619 (D.D.C. August 5, 2022) (Howell, C.J.); United *States v. Rahm*, 21-cr-150 (D.D.C. August 15, 2022) (Hogan, J.);  *United States v. Bledsoe*, 21-cr-204 (D.D.C. July 15, 2022) (Howell, C.J.); *United States v. Fitzsimons*, 21-cr-158, 2022 WL

1698063, at *6-*12 (D.D.C. May 26, 2022) (Contreras, J.); *United States v. Bingert*, 21-cr-91, 2022 WL 1659163, at *7-*11 (D.D.C. May 25, 2022) (Lamberth, J.); *United States v. Hale-Cusanelli*, No. 21-cr-37 (D.D.C. May 6, 2022) (McFadden, J.) (motion to dismiss hearing at pp. 4-8); *United States v. McHugh* (*McHugh II*), No. 21-cr-453, 2022 WL 1302880, at *2-*13 (D.D.C. May 2, 2022) (Bates, J.); *United States v. Puma*, 21-cr-454, 2022 WL 823079, at *12 n.4 (D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022) (Bates, J.); *United States v. Grider*, 21-cr-22, 2022 WL 392307, at *5-*6 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.); *United States v. Nordean*, 21-cr-175, 2021 WL 6134595, at *6-*8 (D.D.C. Dec. 28, 2021) (Kelly, J.); *United States v. Montgomery*, 21-cr-46, 2021 WL 6134591, at *10-18 (D.D.C. Dec. 28, 2021) (Moss, J.); *United States v. Mostofsky*, No. 21-cr-138, 2021 WL 6049891, at *11 (Dec. 21, 2021) (Boasberg, J.); *United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718, at *11-*21 (D.D.C. Dec. 20, 2021) (Mehta, J.); *United States v. Sandlin*, No. 21-cr-88, 2021 WL 5865006, at *5-*9 (D.D.C. Dec. 10, 2021) (Friedrich, J.).

## **FACTUAL BACKGROUND**

*General Facts*

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress convened in the United States Capitol building. The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election. With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol. As early as 12:50 p.m., certain individuals in the crowd forced their way through, up, and over erected barricades. The crowd, having breached police officer lines, advanced to the exterior façade of the building. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into

the U.S. Capitol. At approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to – and did – evacuate the chambers.

*Facts Specific to Defendant Foy*

Foy traveled to Washington, D.C. from Michigan on or about January 6, 2021, to attend the "Stop the Steal" rally, which was organized to protest the result of the presidential election. After attending the rally, Foy joined a large crowd at the Capitol, where the Joint Session to certify the Electoral College vote was underway.

Foy unlawfully entered the Capitol grounds. Later, Foy went to the Lower West Terrace area of the Capitol where Foy willfully and deliberately used a hockey stick and a metal pole to repeatedly strike and stab at Officers D.P. and L.M. Foy was not acting in self-defense at the time he used that weapon to repeatedly strike or stab at Officers D.P. and L.M., in the face, head, neck, and body area.

Foy assaulted Officers D.P. and L.M. while attempting to break through the center doorway on the Lower West Terrace to gain entrance to the U.S. Capitol Building.

Specifically, Foy began striking a group of Metropolitan Police Officer ("MPD") with his hockey stick who were assisting in the protection of the U.S. Capitol. This attack continued for approximately 16 seconds until Foy was knocked down by another rioter.

Subsequently, Foy raised his hockey stick above his head in celebration, shouting and encouraging the other rioters "Let's Go," while pointing at the U.S. Capitol building. At approximately 3:59 p.m., Foy crawled through a broken window into the U.S. Capitol with his hockey stick in hand. While inside, Foy encouraged other rioters to assault the officers as well as to join him inside the U.S. Capitol.

## PROCEDURAL HISTORY

A grand jury charged Foy with: (1) Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); (2) Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; (3) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); (4) Entering or Remaining in any Restricted Building or Grounds With a Deadly Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A), and; (5) Entering or Remaining in any Restricted Building or Grounds With a Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(1), and; (6) Disorderly and Disruptive Conduct in a Restricted Building or Ground, in violation of 18 U.S.C. § 1752(a)(2), and; (7) Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4), and; (8) Act of Physical Violence on the Capitol Grounds, in violation of 40 U.S.C. §§ 5104(e)(2)(F). (ECF No. 55.)

On September 28, 2022, Foy filed a Motion to Dismiss Count Two of the Superseding Indictment.  (ECF No. 71.)  A trial is scheduled for January 30, 2023.

## LEGAL STANDARD

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). And an indictment need not inform

a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) (motions for summary judgment are creatures of civil, not criminal trials); *Yakou*, 428 F.2d at 246-47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-cr-40-BAH at *5, 2020 WL 6342940 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination.

Thus, when ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and more specifically, the language used to charge the crimes. *Bingert*, 21-cr-93 (RCL) (ECF 67:5) (a motion to dismiss challenges the adequacy of an indictment on its face and the relevant inquiry is whether its allegations permit a jury to find that the crimes charged were committed); *McHugh*, 2022 WL 1302880 at *2 (a motion to dismiss involves the Court's determination of the legal sufficiency of the indictment, not the sufficiency of the evidence); *United States v. Puma*, No. 21-cr-454 (PLF), 2020 WL 823079 at *4 (D.D.C. Mar. 19, 2022) (quoting *United States v. Sunia*, 643 F.Supp. 2d 51, 60 (D.D.C. 2009)).

## ARGUMENT

**I.    The Defendant's Motion to Dismiss Count Two of the Indictment, Alleging a Violation of 18 U.S.C. § 1512(c)(2), Lacks Merit.**

Count Two of the Indictment charges Foy with corruptly obstructing, influencing, or impeding an "official proceeding," – *i.e.*, Congress's certification of the Electoral College vote on January 6, 2021 – in violation of 18 U.S.C. § 1512(c)(2). Count Two states:

> On or about January 6, 2021, within the District of Columbia and elsewhere, **MICHAEL JOSEPH FOY**, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.
>
> (**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

(ECF No. 55.)

 In 2002, Congress enacted Section 1512(c)'s prohibition on "[t]ampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807. Section 1512(c)'s prohibition applies to:

> [w]hoever corruptly--

> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.*

18 U.S.C. § 1512(c) (emphasis added). Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). By the statute's plain terms, then, a person violates Section 1512(c)(2) when, acting with the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding, including, as here, Congress's certification of the Electoral College vote.

Notwithstanding the plain terms of the offense, Foy advances three arguments for the notion that Section 1512(c)(2) does not reach the conduct alleged in the indictment: (1) that the conduct Foy committed cannot qualify as taking action with respect to a document, record, or other object conduct that "otherwise obstructs, influences, or impedes" the official proceeding; 2) that Congress's certification of the Electoral College vote is not an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2); and (3) that the statute is unconstitutionally vague itself. (ECF No. 71.) Foy's claims lack merit.

With respect to his challenges, multiple judges of this Court have considered, in other cases arising out of the events at the Capitol on January 6, 2021, one or more of the arguments Foy raises. *See, e.g., Bingert*, 2022 WL 1659163 at *2 n.3. Every judge to have reached the issue has concluded that Congress's certification of the Electoral College is an "official proceeding" within the meaning of 18 U.S.C. 1512(c)(2) and that Section 1512(c)(2) is not unconstitutionally vague. In addition, every reported court of appeals decision to have considered the scope of Section 1512(c)(2), and all but one of the judges of this Court to have considered the issue in cases involving January 6, 2021, have concluded that Section 1512(c)(2) prohibits obstruction regardless

of its connection to documentary or tangible evidence.  And, in any event, even if a nexus to documentary or tangible evidence were required, the allegations in the Indictment, which track the statutory language, adequately inform the defendant about the charge against him; nothing more is required. *See, e.g.*, *United States v. Williamson*, 903 F.3d 124, 130-131 (D.C. Cir. 2018).

A.      **Section 1512(c)(2) Applies to the Conduct Alleged in the Indictment.**

Foy's first argument relies upon Judge Nichols' decision in *United States v. Garret Miller,* 1:21-CR-119 (CJN), ECF No. 72 and contends that Foy's conduct, like that of Miller, fails to fit within the scope conduct prohibited by § 1512(c)(2).  But *Miller* was wrongly decided, because § 1512(c)(2) is "not limited by subsection (c)(1) – which refers to 'alter[ing], destroy[ing], mutilat[ing] or conceal[ing] a record, document, or other object' specifically." *United States v. Robertson*, 2022 WL 2438546, *3 (D.D.C. July 5, 2022).

1.      **Section 1512(c)(2)'s text, structure, and history confirm that its prohibition covers obstructive conduct unrelated to documentary evidence.**

In Section 1512(c)(2), Congress prohibited conduct that intentionally and wrongfully obstructs official proceedings. The ordinary meaning of "obstruct[], influence[], or impede[]" encompasses a range of conduct designed to frustrate an official proceeding.  That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, or burning a building to conceal the bodies of murder victims.  It also includes storming the Capitol to derail a congressional proceeding.  A defendant who, acting with the necessary *mens rea*, obstructs Congress's certification of the Electoral College vote, commits a crime under Section 1512(c)(2).

a. **Section 1512(c)'s text and structure confirm that Section 1512(c)(2) is not limited to document-related obstructive conduct**.

Section 1512(c)(2)'s plain text demonstrates that it prohibits any corrupt conduct that

intentionally obstructs or impedes an official proceeding.  When interpreting a statute, courts look first to the statutory language, "giving the words used their ordinary meaning."  *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted).  If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted).  Here, the meaning of "obstruct[], influence[], or impede[]" is controlled by the ordinary meaning of those words.

The verbs Congress selected in Section 1512(c)(2) are "noncontroversial."  *Montgomery*, 2021 WL 6134591, at *10.  The words "obstruct" and "impede" naturally "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'"  *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries).  Similarly, "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on." *Influence*, Oxford English Dictionary, *available at* http://www.oed.com.  These verbs plainly apply to obstructive conduct that otherwise might not fall within the definition of document or evidence destruction.  *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013).  When read with Section 1512(c)(2)'s subject ("whoever") and object ("any official proceeding"), those verbs prohibit a defendant "from coming in the way of, blocking, or holding up the business conducted by an official body, such as a court or the Congress, when that body has formally convened for the purpose of conducting that business." *Montgomery*, 2021 WL 6134591, at *10.

Comparing the language in Section 1512(c)(1) to that in Section 1512(c)(2) confirms that the latter, unlike the former, is not a document-focused provision.  Section 1512(c) consists of two provisions requiring the defendant to act "corruptly."  Both contain a string of verbs followed by one or more direct objects. Section 1512(c)(1) applies to whoever corruptly "alters, destroys,

mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." The objects—"a record, document, or other object"—are static. In contrast, Section 1512(c)(2) applies to whoever corruptly "obstructs, influences, or impedes any official proceeding." The object—"proceeding"—is dynamic, and the verbs that precede it are all intended to change the movement or course of that "proceeding." They are verbs that do not apply to a fixed "record" or "document" or an inanimate "object." The two sections are related through their connection to an official proceeding: Section 1512(c)(1)'s verbs target forms of evidence tampering (*e.g.*, altering, destroying mutilating) directed at the documents, records, and objects that are used in official proceedings, while Section 1512(c)(2)'s verbs take the proceeding itself as the object—thus prohibiting whatever conduct blocks or interferes with that proceeding without regard to whether that conduct involved documentary or tangible evidence.

Importing into Section 1512(c)(2) a nexus-to-documents requirement would not only require inserting an extratextual gloss, *see Dean v. United States*, 556 U.S. 568, 572 (2009) (courts "ordinarily resist reading words or elements into a statute that do not appear on its face") (internal quotation marks omitted), it would also render the verbs in Section 1512(c)(2) inapt. The *actus reus* that the verbs in Section 1512(c)(2) encompass is obstructing, influencing, and impeding. But "[h]ow [could] anyone [] alter, destroy, mutilate or conceal an 'official proceeding' or how [could] anyone [] 'obstruct[], influence[], or impede[]' 'a record, document, or other object'?" *Montgomery*, 2021 WL 6134591, at *14; *accord Fitzsimons*, 2022 WL 1698063, at *12; *cf. Yates v. United States*, 574 U.S. 528, 551 (2015) (Alito, J., concurring) (rejecting interpretation of "tangible object" in Section 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at

544 (plurality opinion) ("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon.").  Such a mismatch is all the more unlikely given how readily Congress could have drafted language that supplies a nexus to documents in Section 1512(c)(2).  *See Montgomery*, 2021 WL 6134591, at *12 (Congress could have enacted a prohibition that covers anyone who "'engages in conduct that otherwise impairs the integrity or availability of evidence or testimony for use in an official proceeding'").

The resemblance between the operative verbs in Section 1512(c)(2) and those Congress enacted in two other obstruction provisions, 18 U.S.C. §§ 1503(a) and 1505, demonstrates that Section 1512(c)(2) was designed to reach more than document-related obstructive conduct. Congress drafted the "omnibus clause" in Section 1503(a), which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing] . . . the due administration of justice," to serve as a "catchall provision," *United States v. Aguilar*, 515 U.S. 593, 599 (1995), that criminalizes obstructive conduct that falls outside the narrower prohibitions within Section 1503(a) and neighboring provisions.  *See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 168-70 (3d Cir. 2013) (removing gold coins from safe-deposit box); *United States v. Frank*, 354 F.3d 910, 916-19 (8th Cir. 2004) (removing car to avoid seizure); *United States v. Lefkowitz*, 125 F.3d 608, 619-20 (8th Cir. 1997) (instructing employee to remove documents from a house); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-98 (9th Cir. 1982) (warning suspect about impending search warrant to prevent discovery of heroin). Section 1505, which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing] . . . the due and proper administration of the law under which any pending proceeding is being had," has been construed to have a similar scope. *See, e.g.*, *United States v. Vastardis*, 19 F. 4th 573, 587 (3d Cir. 2021) (manipulating an oil content meter to produce an inaccurate reading during a Coast

Guard inspection and making a related false statement). Like Section 1512(c)(2), Sections 1503(a) and 1505 do not include "any limitation on the nature of the obstructive act other than that it must be committed 'corruptly,'" which "gives rise to 'a fair inference' that 'Congress intended [Section 1512(c)(2)] to have a [broad scope].'" *McHugh*, 2022 WL 1302880, at *10 (quoting *Miller* at 114).

Consistent with the interpretation that obstructive behavior may violate Section 1512(c)(2) even where the defendant does not "take[] some action with respect to a document," *Miller* at 117, courts of appeals have upheld convictions under Section 1512(c)(2) for defendants who attempted to secure a false alibi witness while in jail for having stolen a vehicle, *United States v. Petruk*, 781 F.3d 438, 440, 447 (8th Cir. 2015); disclosed the identity of an undercover federal agent to thwart a grand jury investigation, *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009); lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-09; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014); and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (unpublished); *see also United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects before issuance or execution of search warrants), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target).

Interpreted correctly, Section 1512(c)(2) applies to Foy's conduct, which involved trespassing into the restricted Capitol grounds and interfering with law enforcement for the purpose of stopping the certification. In so doing, Foy hindered and delayed an "official proceeding" before

Congress.  *See* 18 U.S.C. § 1515(a)(1)(B). Because construing Section 1512(c)(2) to reach such conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

> **b. The term "otherwise" reinforces that Section 1512(c)(2) covers obstructive conduct "other" than the document destruction covered in Section 1512(c)(1).**

Foy's textual analysis overlooks Section 1512(c)(2)'s verbs and focuses almost entirely on the term "otherwise." But that term, properly interpreted, does not support such a narrowed interpretation of Section 1512(c)(2).

The term "otherwise" means "in another way" or "in any other way."  *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com.  Consistent with its ordinary meaning, the term "otherwise" conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that Section 1512(c)(1) proscribes. *Burge*, 711 F.3d at 809; *Petruk*, 781 F.3d at 446-47 (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *United States v. Ring*, 628 F.Supp.2d 195, 224 n.17 (D.D.C. 2009) (noting that Section 1512(c)(2) is "plainly separate and independent of" Section 1512(c)(1), and declining to read "otherwise" in Section 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering");  *see also Gooch v. United States*, 297 U.S. 124, 126-28 (1936) (characterizing "otherwise" as a "broad term" and holding that a statutory prohibition on kidnapping "'for ransom or reward or otherwise'" is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit); *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C. § 2466(a)(1)(C) to reach beyond the

"specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court"). That reading follows inescapably from the text of Section 1512(c)'s two subsections read together: Section 1512(c)(1) "describes how a defendant can violate the statute by 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing]' documents for use in an official proceeding," *Puma*, 2022 WL 823079, at *12, while "otherwise" in Section 1512(c)(2) "signals a shift in emphasis . . . from actions directed at evidence to actions directed at the official proceeding itself," *Montgomery*, 2021 WL 6134591, at *12 (internal quotation marks omitted).

In this way, Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)(1)—obstruction of an official proceeding—when that result is accomplished by a different means, *i.e.*, by conduct *other* than destruction of a document, record, or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503(a), which criminalizes the result of obstructing the due administration of justice, provides specific means of accomplishing that result and then a separate catchall clause designed to capture other means). Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records under Section 1512(c)(1). *Petruk*, 781 F.3d at 447 (quoting *Volpendesto*, 746 F.3d at 286).

Contrary to Foy's suggestion that Section 1512(c)(2) is untethered to Section 1512(c)(1), "otherwise" as used in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1). That understanding of "otherwise" is fully consistent with any reasonable definition of the term and does not render the term "surplusage."

This interpretation is not inconsistent with the canons of construction used in *Begay v.*

*United States*, 553 U.S. 137 (2008) and *Yates v. United States*, 574 U.S. 528 (2015). In considering whether driving under the influence was a "violent felony" for purposes of the Armed Career Criminal Act ("ACCA")'s residual clause, which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury*," 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added), the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure than Section 1512(c)(2). *See Sandlin*, 2021 WL 5865006, at *6 (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"). Unlike in the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting examples." *Ring*, 628 F.Supp.2d at 224 n.17. In other words, the "key feature" in Section 924(e)(2)(B)(ii) at issue in *Begay*, "namely, the four example crimes," 553 U.S. at 147, is "absent" in Section 1512(c)(2). *Caldwell*, 2021 WL 6062718, at *14. Although the Court recognized the structural difference between the ACCA residual clause and Section 1512(c)(2), *see Miller* at 107-08, it offered no reason to import *Begay*'s interpretation of "otherwise" to Section 1512(c)(2)'s differently structured provision.

In fact, Section 1512(c)(2) is a poor fit for application of the *ejusdem generis* canon that *Begay* applied to the ACCA residual clause and that the Court functionally applied to Section 1512(c). "Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category." *United States v. Espy*, 145 F.3d 1369, 1370-71 (D.C. Cir. 1998). In *Yates*, for example, the plurality and concurring opinions applied the *ejusdem generis* canon to interpret the word "tangible object" in 18 U.S.C. § 1519, which makes it a crime to "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y],

or make[] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence" an investigation. *See* 574 U.S. at 545-56 (plurality opinion); *id.* at 549-50 (Alito, J., concurring). But Section 1512(c)'s structure differs significantly: it includes one numbered provision that prohibits evidence-tampering, followed by a semi-colon, the disjunctive "or," and then a separately numbered provision containing the separate catchall obstruction prohibition. "The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). Furthermore, in the same way that the *ejusdem generis* canon does not apply to the omnibus clause in Section 1503 that is "one of . . . several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable," *Aguilar*, 515 U.S. at 615 (Scalia, J., concurring in part and dissenting in part), it has no application to Section 1512(c)(2), which embodies the same structure. *Cf. Loughrin v. United States*, 573 U.S. 351, 359 (2014) (distinguishing the mail fraud statute (18 U.S.C. § 1341), which "contains two phrases strung together in a single, unbroken sentence," from the bank fraud statute (18 U.S.C. § 1344), which comprises "two clauses" with "separate numbers, line breaks before, between, and after them, and equivalent indentation—thus placing the clauses visually on an equal footing and indicating that they have separate meanings"); *see also McHugh*, 2022 WL 1302880, at *5 (explaining that the *ejusdem generis* canon on which *Miller* relied is "irrelevant" because rather than the "'A, B, C, or otherwise D'" structure found in the ACCA residual clause, Section 1512(c) "follows the form '(1) A, B, C, or D; or (2) otherwise E, F, or G'").

Moreover, *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii)— burglary, arson, extortion, or crimes involving explosives—indicated that the ACCA residual

clause covered only similar crimes. *Begay*, 553 U.S. at 142. Those examples, the majority reasoned, demonstrated that Section 924(e)(2)(B)(ii) was not designed "to be all encompassing," but instead to cover only "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Id.* at 142-43.  The majority next drew support for its conclusion from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" that would have covered offenses involving the substantial use of physical force and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples. *Id.* at 143-44. In the final paragraph of that section of the opinion, the majority addressed "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "*sufficient* to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' *can* (we do not say *must* . . .) refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144.

The majority's "remarkably agnostic" discussion of "otherwise" in *Begay*, which explicitly noted that the word may carry a different meaning where (as here) the statutory text and context indicates otherwise, *Montgomery*, 2021 WL 6134591, at *11, suggests, if anything, that "*the government's* interpretation of 'otherwise' [in Section 1512(c)(2)] is the word's more natural reading," *McHugh*, 2022 WL 1302880, at *5 n.9; *see also Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" to mean "'in a different way or manner'" based on the discussion in *Begay*).  In short, the majority in *Begay* "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 2021 WL 6134591, at *11.

Whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s holding and the subsequent interpretation of the ACCA residual clause demonstrate the central flaw with imposing an extratextual requirement within Section 1512(c)(2).  The Supreme Court

held in *Begay* that Section 924(e)(2)(B)(ii) encompasses only crimes that, similar to the listed

examples, involve "purposeful, 'violent,' and 'aggressive' conduct." 553 U.S. at 144-45. But

"*Begay* did not succeed in bringing clarity to the meaning of the residual clause." *Johnson v.*

*United States*, 576 U.S. 591, 600 (2015). Just as the *Begay* majority "engraft[ed]" the "purposeful,

violent, and aggressive conduct" requirement onto the ACCA's residual clause, 553 U.S. at 150

(Scalia, J., concurring in judgment) (internal quotation marks omitted), so too would Foy's

proposed interpretation engraft onto Section 1512(c)(2) the requirement that a defendant "have

taken some action with respect to a document, record, or other object" to obstruct an official

proceeding.  In the nearly 20 years since Congress enacted Section 1512(c)(2), no reported cases

have adopted that interpretation, and for good reason.  That interpretation would give rise to

unnecessarily complex questions about what sort of conduct qualifies as "tak[ing] some action

with respect to a document" in order to obstruct an official proceeding. *Cf. United States v.*

*Singleton*, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished)

(concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not

necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-

cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation

of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceeding[]

through his conduct in relation to a tangible object").[1]  In brief, Foy's interpretation is likely to

---

[1] Foy's interpretation of Section 1512(c)(2) resembles the reading given in *Singleton* and
*Hutcherson*, both of which are unpublished. As noted in the main text, no other court, at least in a
reported opinion, appears to have adopted the nexus-to-tangible-evidence-or-a-tangible-object
standard articulated in *Singleton* and *Hutcherson*. *See United States v. De Bruhl-Daniels*, 491
F.Supp.3d 237, 250-51 (S.D. Tex. 2020) (identifying *Singleton* and *Hutcherson* as outliers from
the "most popular—and increasingly prevalent—interpretation of § 1512(c)(2) [as] an unlimited
prohibition on obstructive behavior that extends beyond merely tampering with tangible items");
*Ring*, 628 F.Supp.2d at 225 n.18 (disagreeing with *Singleton* and *Hutcherson* but finding that the

give rise to the very ambiguity it purports to avoid.

    **c.  Tools of statutory interpretation do not support the *Miller* Court's narrowed interpretation.**

    Other tools of statutory construction reinforce the conclusion that Section 1512(c)(2) reaches conduct that obstructs or impedes an official proceeding in a manner other than through document destruction or evidence tampering.

    Section 1512 is comprised of two parts: four subsections that define criminal offenses (Sections 1512(a)-(d)), followed by six subsections that provide generally applicable definitions and clarifications (Sections 1512(e)-(j)).[2] Within the first part, three subsections (Sections 1512(a)-(c)) define criminal offenses with statutory maxima of at least 20 years, *see* §§ 1512(a)(3), (b)(3), (c), while Section 1512(d) carries a three-year statutory maximum, § 1512(d). Within that structure, Congress sensibly placed Section 1512(c)(2) at the very end of the most serious—as measured by statutory maximum sentences—obstruction offenses, precisely where a "catchall" for obstructive conduct not covered by the more specific preceding provisions would be expected. In any event, the "mousehole" canon provides that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001), but it "has no relevance" where, as here, the statute in question was written in "broad terms," *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1753 (2020).

    Foy's professed concern that a reading of Section 1512(c)(2) that encompasses obstructive

---

alleged conduct at issue in that case involved "some nexus to documents"). No court of appeals has cited either case.

[2] Section 1512 also includes one subsection, placed at the end, that adds a conspiracy offense applicable to any of the substantive offenses set out in Sections 1512(a)-(d). 18 U.S.C. § 1512(k).

conduct unrelated to documents would "swallow up" the remainder of Section 1512 (Br. 8) is unfounded.  Overlap is "not uncommon in criminal statutes," *Loughrin*, 573 U.S. at 358 n.4, and Section 1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause . . . serves as a catchall for matters not specifically contemplated."  *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009).  Moreover, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005).

Any overlap between Section 1512(c)(2) and other provisions in Section 1512 has a "simple" explanation that does not warrant the Court's narrowing construction. *McHugh*, 2022 WL 1302880, at *8. When Congress enacted the "direct obstruction" provision in Section 1512(c)(2), that provision necessarily included the "indirect obstruction prohibited" in the rest of Section 1512. *Id.* Congress in Section 1512(c)(2) therefore did not "*duplicate* pre-existing provisions . . . but instead *expanded* the statute to include additional forms of obstructive conduct, necessarily creating overlap with the section's other, narrower prohibitions." *Id.*  Congress was not required to repeal those pre-existing prohibitions and rewrite Section 1512 "to create a single, blanket obstruction offense" just to avoid overlap. *Id.* at *9.  "Redundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there," *id.* at 253-54.  In other words, Section 1512(c)(2) "creates only explicable and indeed inevitable overlap rather than outright redundancy," such that the "purported superfluity" in Section 1512 "simply does not justify displacing the provision's ordinary meaning."  *McHugh*, 2022 WL 1302880, at *10.  That is particularly so here because even a "broad interpretation of §

1512(c)(2) does not entirely subsume numerous provisions within the chapter," and any overlap with other provisions in Section 1512 is "hardly remarkable." *Sandlin*, 2021 WL 5865006, at *8; *accord Nordean*, 2021 WL 6134595, at *8.

Notably, Foy's interpretation injects a more troubling type of superfluity. Construing Section 1512(c)(2) to require some action with respect to a document, risks rendering Section 1512(c)(2) itself superfluous in light of the "broad ban on evidence-spoliation" in Section 1512(c)(1). *Yates*, 574 U.S. at 541 n.4 (plurality opinion) (internal quotation marks omitted); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (explaining that limiting the catchall provision in Section 1503(a)'s omnibus clause to obstructive acts "directed against individuals" would render the omnibus clause superfluous because "earlier, specific[] prohibitions" in Section 1503(a) "pretty well exhaust such possibilities") (internal quotation marks omitted). The canon against surplusage is "strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). It is even stronger here, when it would render superfluous "other provisions in the *same enactment*"—namely, the Sarbanes-Oxley Act. *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) (emphasis added; internal quotation marks omitted). At a minimum, the canon does not militate in favor of the defendant's reading. *See United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013) (canon against surplusage "'merely favors that interpretation which avoids surplusage,' not the construction substituting one instance of superfluous language for another").

Finally, an interpretation of Section 1512(c)(2) that imposes criminal liability only when an individual takes direct action "with respect to a document, record, or other object" to obstruct a qualifying proceeding leads to absurd results. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (rejecting interpretation of a criminal statute that would "produce results that

were not merely odd, but positively absurd").  That interpretation would appear, for example, not to encompass an individual who seeks to "obstruct[], influence[], or impede[]" a congressional proceeding by explicitly stating that he intends to stop the legislators from performing their constitutional and statutory duties to certify the Electoral College vote results by dragging lawmakers out of the Capitol and leading a mob to charge toward federal officers, pushing them aside to break into the Capitol, unless he also picked up a "document or record" related to the proceeding during that violent attack.  The statutory text does not require such a counterintuitive result.

In short, if Congress in Section 1512(c)(2) endeavored to create the narrow document-focused provision that the Court envisioned, it "did a particularly poor job of drafting" because Congress would have "effectuated [its] intent in a way that is singularly susceptible to misinterpretation, as evidenced by the overwhelming majority of judges who have construed § 1512(c)(2) broadly." *McHugh*, 2022 WL 1302880, at *11. In accordance with those judges, the Court should reject Foy's atextual, narrowed interpretation.

**d.  Legislative history does not support the *Miller* Court's narrowed interpretation.**

Because "the statutory language provides a clear answer," the construction of Section 1512(c)(2) "ends there," and resort to legislative history is unnecessary. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).  Regardless, the legislative history of Section 1512(c)(2)—particularly when considered alongside the history of Section 1512 more generally—does not support the defendant's interpretation of Section 1512(c)(2) for two reasons.

First, Section 1512(c) aimed at closing a "loophole" in Section 1512: the existing prohibitions did not adequately cover a defendant's *personal* obstructive conduct *not* aimed at another person. *See* 148 Cong. Rec. S6550 (statement of Sen. Hatch). To close that loophole,

22

Section 1512(c)(1) criminalizes a defendant's firsthand destruction of evidence (without having to prove that the defendant induced another person to destroy evidence) in relation to an official proceeding, and Section 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that *otherwise* impedes or influences an official proceeding (though not necessarily through another person). *See Burge*, 711 F.3d at 809-10. Foy's limiting construction undermines Congress's efforts at loophole closing.

Second, no substantive inference is reasonably drawn from the fact that the title of Section 1512 does not precisely match the "broad proscription" it in fact contains, given that the Sarbanes-Oxley Act unequivocally and broadly entitled the new provisions now codified in Section 1512(c), "Tampering with a record *or* otherwise impeding an official proceeding." Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered). Section 1512's title is more limited simply because Congress did not amend the pre-existing title when it added the two prohibitions in Section 1512(c) in 2002. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (describing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text").

And while the legislators who enacted Section 1512(c) in the Sarbanes-Oxley Act undoubtedly had document shredding foremost in mind, "it is unlikely that Congress was concerned with only the type of document destruction at issue in the *Arthur Andersen* case." *Montgomery*, 2021 WL 6134591, at *16. In other words, "there is no reason to believe that Congress intended to fix that problem only with respect to 'the availability or integrity of evidence.'" *Id.* In addition, if the defendant's narrow interpretation were correct, then certain floor statements, such as Senator Hatch's description of Section 1512(c)'s purpose to strengthen an obstruction offense "often used to prosecute document shredding *and other forms of obstruction*

*of justice*," 148 Cong. Rec. S6550 (emphasis added), "would be quite strange." *McHugh*, 2022 WL 1302880, at *12.

    **e.  The rule of lenity does not apply.**

    Text, structure, history, and other tools of statutory interpretation unambiguously demonstrate that Section 1512(c)(2) prohibits any conduct that obstructs or impedes an official proceeding, and the *mens rea* and nexus requirements ensure that the provision does not ensnare conduct that is "not inherently malign." *Arthur Andersen*, 544 U.S. at 704. Accordingly, the rule of lenity has no role to play.

    "When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Bell v. United States*, 349 U.S. 81, 83 (1955). That principle underlies the "venerable rule of lenity," *United States v. R.L.C.*, 503 U.S. 291, 305 (1992) (opinion of Souter, J.), which ensures that "legislatures and not courts" define criminal activity given the "seriousness of criminal penalties" and the fact that "criminal punishment usually represents the moral condemnation of the community." *United States v. Bass*, 404 U.S. 336, 348 (1971); *see Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

    The rule of lenity does not come into play when a law merely contains some degree of ambiguity or is difficult to decipher. The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524

U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019). In short, some ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted). "Properly applied, the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'" *Wooden v. United States*, 142 S. Ct. 1063, 1075 (2022) (Kavanaugh, J., concurring) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

Simply put, the rule of lenity is "inapplicable" here. *Sandlin*, 2022 WL 5865006, at *10. Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings—regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself. Any such distinction between these forms of obstruction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens those conducting that proceeding escapes criminal liability under the statute. Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted. *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws."). It would strain credulity for any defendant who was focused on stopping an official proceeding through unlawful means to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so." 18 U.S.C. § 1512(c)(2).

**f.   Even if Section 1512(c)(2) required that the obstructive act relate to documentary evidence, Defendant Foy's conduct would be covered.**

Neither ordinary methods of statutory construction nor the rule of lenity supports limiting to Section 1512(c)(2) to document-based obstructive conduct.  But even if Section 1512(c)(2) were so limited, it necessarily reaches beyond the direct evidence tampering already covered by Section 1512(c)(1) to include alternative ways of interfering with the consideration of documentary evidence—as happened here when the defendant impeded lawmakers' consideration of documents and records at the Electoral College vote certification proceeding.

At a minimum, Section 1512(c)(2) covers conduct that prevents the examination of documents, records, and other nontestimonial evidence in connection with an official proceeding. Even assuming a focus on documentary evidence, the additional conduct that it would cover beyond Section 1512(c)(1) would include, for example, corruptly blocking the vehicle carrying the Electoral College vote certificates to the Capitol for congressional examination at the certification proceeding, which would not "alter[], destroy[], mutilate[], or conceal[]" that evidence under 1512(c)(1), but would plainly "obstruct[]" or "impede[]" the proceeding with respect to that evidence under Section 1512(c)(2).  For similar reasons, Section 1512(c)(2) would likewise cover blocking a bus carrying lawmakers to the Capitol to examine the certificates at the certification proceeding.  And it just as readily covers displacing lawmakers from the House and Senate Chambers, where they would examine and discuss those certificates and other records.

The Electoral College vote certification is rooted in constitutional and federal statutory law that requires the creation and consideration of various documents, and that certification operates through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections. Had Foy sought to alter or destroy any of those documents, he would have

violated Section 1512(c)(1).  Here, Foy allegedly sought to stop Members of Congress from reviewing those constitutionally and statutorily mandated documents at a proceeding to certify the results of the 2020 presidential election. Thus, even if a violation of Section 1512(c)(2) covered only obstructive behavior that prevents the consideration of documents, records, or other objects at an official proceeding, Foy's alleged conduct—corruptly obstructing and impeding the examination of physical or documentary evidence at a congressional proceeding—states an offense.

II.     **Congress's Joint Session to Certify the Electoral College Vote Is a "Proceeding Before the Congress" under Section 1515(a)(1)(B) And, Therefore, an "Official Proceeding" under Section 1512(c)(2)**

A.  **The plain text of the statute established that the Joint Session is an "official proceeding."**

To determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted). Section 1515(a)(1)(B), as noted, defines "official proceeding" as a "proceeding before the Congress." In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, or "a proceeding before the Congress." Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation omitted); *Bingert*, 2022 WL 1659163 at *4.

Congress's Joint Session to certify the Electoral College vote constitutes a "proceeding" under any interpretation of that term.  In its broadest and most "general sense," a "proceeding" refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting *Proceeding*, Oxford English Dictionary, available at http://www.oed.com). Foy cannot meaningfully contend

that Congress's Joint Session to certify the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding – and indeed an official proceeding – under that broad definition.

A narrower definition of the term "proceeding" would look to the "legal – rather than the lay – understanding" of the term. *Ermoian*, 752 F.3d at 1170. This narrower definition includes the "business conducted by a court or other official body; a hearing." Black's Law Dictionary, "Proceeding" (11th ed. 2019). Taken with its modifier "official," the term "proceeding" thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170. But even under this narrower definition, Congress's Joint Session to certify the Electoral College vote – business conducted by an official body, in a formal session – would easily qualify.

The formality involved in the certification of the Electoral College vote places it well within the category of an official proceeding, even under the narrower legal definition of the term "proceeding." Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for Congress's certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Required by law to begin at 1:00 pm on the January 6 following a presidential election, Congress's meeting to certify the Electoral College vote is both a "hearing" and "business conducted by … [an] official body." *See* Black's Law Dictionary, "Proceeding." The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific

locations in a courtroom, so too do the Members within the "Hall."  *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform").  Congress's certification of the Electoral College vote, moreover, must terminate with a decision:  Congress may not recess until "the count of electoral votes" is "completed," and the "result declared."  *Id.*

Under the plain meaning of Sections 1512(c)(2) and 1515(a)(1)(B), Congress's Joint Session to certify the Electoral College vote is a "proceeding before the Congress."  That alone disposes of the defendants' contentions. *See Bingert*, 2022 WL 6159163 at *4 (extensive procedural requirements of the Electoral College certification delineated in 3 U.S.C. § 15 qualify the certification as a proceeding before Congress).

### 1. Congress's certification of the Electoral College vote would qualify as an adjudicatory proceeding.

Even if the statute required the "administration of justice" gloss urged by Foy, Congress's certification of the Electoral College vote as set out in the Electoral Count Act of 1887 would satisfy it.  The certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]." 3 U.S.C. § 15. That Joint Session renders judgment on whether to certify the votes cast by Electors in the presidential election. Under the Constitution, the Electors create "lists" of the presidential and vice-presidential candidates, which they "sign" and "certify" before sending to Congress.  U.S. Const. amend. XII.  Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count Act. 3 U.S.C. § 15.  As in an adjudicative setting, parties may lodge objections to the certification, and if any such

objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it. 3 U.S.C. § 15.  And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result." 3 U.S.C. § 16. Even under the defendant's theories, Congress's certification of the Electoral College vote possesses sufficient "tribunal-like" characteristics to qualify as an "official proceeding," as several judges of this District have already concluded. *See Robertson*, 2022 WL 969546, at *4*; Sandlin,* 2021 WL 5865006, at *5; *Caldwell*, 2021 WL 6062718, at *11; *Nordean*, 2021 WL 6134595, at *6; *McHugh*, 2022 WL 296304, at *9.

## 2. The attempt to further restrict the term "proceeding before Congress" is unsupported and misconstrues Congress' certification of the Electoral College vote

Foy nevertheless argues for a narrow definition of "official proceeding" in Section 1512. But this narrow reading of the statute finds no textual support when applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress." Had Congress wanted to impose a definition that more closely resembled a quasi-adjudicative setting (as the defendant effectively contends by demanding investigation and evidence as prerequisites for a proceeding), it needed to look only a few provisions away to 18 U.S.C. § 1505, which criminalizes, among other things, the obstruction of (i) "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency; and (ii)  "the due and proper exercise of the power of inquiry under which any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020).  If Congress wished to similarly limit the obstruction prohibition under § 1512(c)(2) to congressional investigations and the like, it could have enacted language similar to Section 1505.  Instead, Congress chose different terms, with

different meanings.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.").  Congress enacted broader language ("a proceeding before the Congress") that covers a broader range of proceedings than only the "inquir[ies] and investigation[s]" envisioned in Section 1505.  That broader definition includes the Electoral College vote certification that defendants obstructed on January 6, 2021.

None of Foy's contrary arguments have merit.  His effort to revise the definition of proceeding relies on the Ninth Circuit's decision in *Ermoian*, 752 F.3d 1165. But *Ermoian* involved a different statutory definition, 18 U.S.C. § 1515(a)(1)*(C)*, and an entirely different issue: whether an FBI investigation counts as "a proceeding before a Federal Government agency which is authorized by law" under Section 1515(a)(1)(C).  In *Ermoian*, the Ninth Circuit reasoned at the outset that the term "proceeding" did not "conclusively resolve whether an FBI investigation qualifies" because narrower definitions of the term "would exclude criminal investigations in the field." 752 F.3d at 1170. This case, which involves a proceeding before Congress and implicates Section 1515(a)(1)*(B)* (and not *(C)*), presents no such question. Judge Moss, and other judges in this district citing *Montgomery*, were free to find *Ermoian*'s analysis unpersuasive or inapplicable given its different facts and interpretation of a different provision under Section 1515 that does not involve Congress.  And, in any event, the Joint Session of Congress to certify the Electoral College vote would satisfy even the narrower formulations of "proceeding" cited in *Ermoian*.  The Joint Session plainly constitutes "*business conducted* by a court *or other official body*; a *hearing*," or "[a] legal … process." *Id.* at 1169 (emphasis added). And there can be no serious dispute that the

Joint Session is a "proceeding … authorized *by law*" or that it has the "sense of formality" that the Ninth Circuit found absent from mere criminal investigations. *Id.* at 1170 (emphasis added).

The neighboring provisions of Chapter 73 (such as 18 U.S.C. §§ 18 U.S.C. §§ 1503, 1504, 1507, 1521) – which criminalize obstruction of other types of investigations and protect judges, jurors, witnesses and the like – underscore how robustly Congress sought to penalize obstructive conduct across a vast range of settings. That Congress wished to penalize efforts to obstruct everything from a federal audit to a bankruptcy case to an examination by an insurance regulatory official only crystallizes that it is more the acts of obstructing, influencing, or impeding – than the particular type of hearing – that lie at "'the very core of criminality' under the statute[s]." *Williamson*, 903 F.3d at 131.  Even putting aside that the "best evidence of [a statute's purpose] is the statutory text adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), the obstruction statute's legislative history confirms that Congress intended "official proceeding" to reach broadly. Although Congress enacted Section 1512(c) as part of the Sarbanes-Oxley Act of 2002, Section 1512(c) adopted – but did not modify – the pre-existing definition of "official proceeding" in Section 1515(a)(1), which had been in place since 1982. *See* Victim and Witness Protection Act of 1982 ("VWPA"), Pub. Law 97-291, § 4(a), 96 Stat. 1252.  And, tellingly, in considering the VWPA in 2002, the Senate Judiciary Committee urged the inclusion of a "broad residual clause" – in a provision that was ultimately omitted from the 1982 enactment, but that resembles the current iteration of Section 1512(c)(2) – precisely because the "purpose of preventing an obstruction or miscarriage of justice cannot be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses.  There must also be protection against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice." S. Rep. 97-532, at 18 (1982).  The upshot

is clear:  when it enacted the operative definition of "official proceeding," Congress intended that

term to be construed broadly, not narrowly. And this case underscores Congress's foresight in

doing so:  Foy sought to thwart justice in an unprecedented and inventive manner, by literally

driving Congress out of the chamber.

Since the events of January 6, 2021, at least 12 judges in this District have considered

whether Congress's certification of the Electoral College vote constitutes an "official proceeding"

for purposes of Section 1512(c)(2).  They have all ruled, as this Court has, that it does, largely

adopting the government's rationale and rejecting the arguments that Foy presses in this case.  *See,*

*e.g.*, *United States v. Robertson*, 2022 WL 969546, at *4 (D.D.C. Feb. 25, 2022); *United States v.*

*Sandlin*, 2021 WL 5865006, at *4 (Freidrich, J.); *United States v. Caldwell*, No. 21-cr-28 (AHM),

---F.Supp.3d---, 2021 WL 6062718, at *7 (D.D.C. Dec. 10, 2021) (Mehta, J.); *United States v.*

*Mostofsky*, No. 21-cr-138 (JEB), ---F.Supp.3d---2021 WL 6049891, at *10 (D.D.C. Dec. 21, 2021)

(Boasberg, J.); *Montgomery*, 2021 WL 6134591, at *4-10 (Moss, J.); *United States v. Nordean*,

No. 21-cr-175 (TJK), ---F.Supp.3d---, 2021 WL 6134595, at *4-6 (D.D.C. Dec. 28, 2021) (Kelly,

J.); *McHugh*, 2022 WL 296304, at *5-9 (Bates, J.); *United States v. Grider*, No. 21-cr-22 (CKK),

---F.Supp.3d---, 2022 WL 392307 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.); *United States v.*

*Miller*, 21-cr-119 (CJN), ---F.Supp.3d---, 2022 WL 823070, at *5 (D.D.C. Mar. 7, 2022) (Nichols,

J.); *United States v. Andries*, No. 21-cr-093 (RC), 2022 WL 768684, at *3-7 (D.D.C. Mar. 14,

2022) (Contreras, J.); *Puma*, 2022 WL 823079, at *4-9 (Friedman, J.).  Nothing in Foy's briefing

warrants departing from that well-reasoned line of decisions.

**III.      Section 1512(c)(2) Is Not Unconstitutionally Vague.**

Finally, Foy contends that Section 1512(c)(2) is unconstitutionally vague. As every judge

in this District to have considered the issue has concluded, Foy is incorrect.

33

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)).  To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)).  A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974).  The "touchstone" of vagueness analysis "is whether the statute, either standing alone

or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

Foy has not overcome the "strong presumpti[on]" that Section 1512(c)(2) is constitutional. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly … obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306. The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent – the state of men's minds – having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

Foy's claim that the word "corruptly" in Section 1512(c)(2) is unconstitutionally vague is incorrect. As Judge Friedman has observed, "[j]udges in this district have construed 'corruptly' to require 'a showing of "dishonesty" or an 'improper purpose'[;], 'consciousness of wrongdoing'[;] or conduct that is 'independently criminal,' 'inherently malign, and committed with the intent to obstruct an official proceeding.'" *Puma*, 2022 WL 823079, at *10 (quoting *Montgomery*, 2021 WL 6134591, at *19; *Bozell*, 2022 WL 474144, at *6; *Caldwell*, 2021 WL 6062718, at *11; and *Sandlin*, 2021 WL 5865006, at *13) (alterations omitted). Under any of these common-sense

constructions, the term "corruptly" "not only clearly identifies the conduct it punishes; it also 'acts to shield those who engage in lawful, innocent conduct – even when done with the intent to obstruct, impede, or influence the official proceeding.'" *Id.* (quoting *Sandlin*, 2021 WL 5865006, at \*13).  It presents no vagueness concern.

Nor does *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), support Foy's attacks on the word "corruptly," for at least three reasons.  First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial. *Id*. at 629-30.  Other courts have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances."  *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g*., *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503). Foy's invocation of *Poindexter* accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id*. at 705 (citation omitted).  In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502. Third, and as noted above, courts have encountered little difficulty when addressing

"corruptly" in Section 1512(c)(2) following *Arthur Andersen*. *See Puma*, 2022 WL 823079, at *10 (quoting *Montgomery*, 2021 WL 6134591, at *19; *Bozell*, 2022 WL 474144, at *6; *Caldwell*, 2021 WL 6062718, at *11; and *Sandlin*, 2021 WL 5865006, at *13) (alterations omitted). Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.

## **CONCLUSION**

For the foregoing reasons, the government respectfully submits that Foy's motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Emory V. Cole*
EMORY V. COLE
Assistant United States Attorney
PA. Bar Number 49136
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7692
Emory.Cole@usdoj.gov