**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-00108 (TSC)** |
| **MICHAEL JOSEPH FOY** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Michael Joseph Foy to 97 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.[1]

## I.   INTRODUCTION

The defendant, Michael Foy participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than 100 police officers, and resulted in more than 2.9 million dollars in losses.[2]

---

[1] In the initial government sentencing memo, the government inadvertently included a reference in the opening paragraph to a fine that it is not seeking. It has been removed in this amended memorandum.

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol were $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021,

Foy violently participated in the January 6, 2021 attack on the United States Capitol—an attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than two million dollars' worth of property damage. At the entrance of the tunnel on the Lower West Terrace ("LWT"), Foy hurled a sharpened metal pole at officers and then used a hockey stick to repeatedly strike police officers in the face, head, neck, and torso.

After those assaults, Foy climbed through a destroyed window and entered the Capitol building. Foy marched through the building amidst the destruction caused by the riot, and obstructed Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

The government recommends that the Court sentence Foy to 97 months of incarceration for his convictions for violating 18 U.S.C. § 111(a)(1) and 18 U.S.C. § 1512(c)(2). A 97-month sentence reflects the gravity of Foy's conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Offense for Stipulated Trial (ECF No. 83) for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of

---

and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 Presidential Election.

**B.      Foy's Role in the January 6, 2021 Attack on the Capitol**

***Michael Joseph Foy's Participation in the January 6, 2021 Capitol Riot***

On the morning of January 6, 2021, Foy traveled alone from his home of Wixom, Michigan to Washington, D.C. with plans to attend the "Stop the Steal" rally. He planned to protest the results of the 2020 presidential election and to urge members of Congress to raise objections to or delay the official certification of electoral votes.  He was dressed in a camouflage jacket and hat, wore a large American flag around his shoulders, and carried a TRUMP 2020 flag. The flag was attached to a hockey stick.



**Figure 1: Michael Foy, circled in red, on the National Mall**

Foy began to march to the U.S. Capitol at approximately 2:00 p.m as part of a large

crowd.



**Figure 2: Michael Foy, boxed in yellow, walking towards the Capitol building**

Foy moved past the "AREA CLOSED" signs and the overturned metal bike racks that police had erected as a barrier delineating a restricted area and entered the restricted Capitol grounds. He moved to the inaugural stage's scaffolding with other rioters. By 4:00 p.m., Foy had climbed to the LWT.



**Figure 3: Michael Foy, boxed in yellow and wearing a parka and carrying his hockey stick, on the LWT**

At approximately 4:25 p.m., Foy approached the archway at the mouth of the LWT tunnel and threaded his way through the mob of rioters in front of the tunnel. He picked up a sharp metal pole and threw it over the head of rioters into the body of a police officer. (Exhibit 1 at 00:12-00:30) The force of the pole knocked the officer into the LWT archway.



**Exhibit 1A[3]: Foy (circled in red) throwing a sharpened metal pole at police officers.**

By 4:26 p.m., police officers had pushed many of the rioters out of the tunnel. *See,* Exhibit 1 at 0:00-0:50 At the same time, however, two other rioters, Jonathan Mellis and Justin Jersey, moved towards the front of the crowd, just ahead of Foy. Foy carried his hockey stick and Jersey carried a large, gnarled wooden stick. Mellis approached Jersey and told him to "knock their masks off." (Exhibit 3). Jersey handed the large, gnarled stick to Mellis, and then, responding to Mellis'

---

[3] Government Exhibits 1-6 in this case were video clips. Screenshots from those exhibits are included in this memo. To ensure clarity of reference, each screenshot in this memo will be labeled by its exhibit number and an alphabetical character.

urging, charged the officers and knocked one officer ("Officer A.W.") to the ground. Mellis, directly in front of Foy, began to stab at the police line with his long, gnarled stick.



**Exhibit 3A: Mellis (in white cowboy hat) takes a gnarled stick from another rioter. Foy, circled in red, stands behind Mellis with his jacket hood up.**

At this moment, the violence reignited on the LWT, with rioters audibly reacting and surging forward, throwing objects at the officers, and striking them with makeshift weapons. Seconds after the Mellis attack, Foy moved within striking range of the officers at the mouth of the tunnel and began his attack on police.



**Exhibit 3B: Foy (circled in red) swinging his hockey stick as he lunges at the police line.**



**Exhibit 5A: Foy (circled in red) prepares to make his first strike with his hockey stick.**

While other rioters engaged in their own violent assaults with OC spray, bare fists, gnarled sticks, stolen batons, and metal crutches, Foy's violence was amongst the most vicious in the melee. Both open source and body worn camera footage show the attack from multiple angles.

7

Swinging his hockey stick, Foy struck at the officers at least 11 times with violent force over the course of 16 seconds. His victims included an injured officer who had already fallen to the ground (Officer A.W.) and an officer whom Foy struck and knocked backwards (Officer D.P.).



**Exhibit 4A:Foy (circled in red) swinging his hockey stick over rioters at MPD Officers. This BWC is from Officer D.P.**

Foy swung his hockey stick over his head and downward at police officers as if he were chopping wood with an ax (*See,* Exhibit 3). Officer A.W.'s body worn camera, taken as Officer A.W. lay prone on the ground, shows Foy swinging down onto Officer A.W.'s exposed body. *Id.* The opening of Officer D.P.'s body worn camera footage captures the moment that Foy's hockey stick blows knocked Officer D.P. backwards into a defensive posture on the ground. (*See,* Exhibit 4). Other officers, also on the ground, can be seen on video while rioters relentlessly struck at them. Officer D.P. remained in a vulnerable position on the ground, attempting to shield her body from further blows, as Foy continued swinging. In the parties' joint "Statement of Offense for Stipulated Trial," ("SOO") Foy admitted he was not acting in self-defense or in defense of others at the time he used the hockey stick to repeatedly assault MPD Officer D.P., in her face, head,

neck, and body area. ECF 83, ¶ 17.



**Exhibit 3C: Foy (circled in red) swinging his hockey stick down on MPD Officers. This BWC is from Officer A.W.**



**Exhibit 6A: Open source video of Foy (circled in red) swinging his hockey stick at MPD Officers, including Officers D.P. and A.W., in the tunnel.**

Moments after assaulting MPD Officers A.W. and D.P., as well as additional officers not named in the SOO, Foy shouted at other rioters, "LET'S GO!" while pointing at the Capitol building. At approximately 4:29 p.m., Foy gained entry to U.S. Capitol building through a shattered window. (Exhibit 2)

 

**Exhibit 2A: Foy (circled in red) climbs into Capitol building through broken window**

He climbed inside, bringing the hockey stick he used to assault officers with him. Once inside, he called out from the window to encourage other rioters to follow him before moving through the building. Photos taken from Foy's cell phone captured rioters standing in the Capitol, glass on the carpet, tables overturned, and evident destruction.



**Figure 9: Photo taken by Foy inside the Capitol building showing destruction by rioters**

In the SOO, Foy admitted to knowing at the time he entered the US Capitol building that he did not have permission to be inside the building. See ECF 83 at ¶ 22. He acknowledged he obstructed and/or attempted to obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote. *Id.*

## III.    THE CHARGES AND STIPULATED TRIAL

On February 10, 2021, a federal grand jury empaneled in the District of Columbia returned an eight-count Indictment charging Michael Foy with: Count 1, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count 2, Obstruction of an Official Proceeding, in violation of 18 U.SC. § 1512(c)(2); Count 3, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); Count 4, Entering and Remaining in a Restricted Building or Grounds with a Deadly

or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); Count 5, Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count 6, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count 7, Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § § 1752(a)(4); and Count 8, Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

On November 10, 2021, a federal grand jury empaneled in the District of Columbia returned an eight-count Superseding Indictment charging Michael Foy with: Count 1, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count 2, Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2); Count 3, Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) and (b); Count 4, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); Count 5, Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count 6, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count 7, Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § § 1752(a)(4); and Count 8, Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

On June 20, 2024, the United States Attorney for the District of Columbia filed a one-count Superseding Information charging Michael Foy with Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 USC § 111(a)(1).

On June 22, 2023, Foy elected to proceed via a stipulated bench trial and was found guilty

of Count 1 of the Superseding Information (Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 USC § 111(a)(1)); and Count 2 of the Superseding Indictment (Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 USC §§ 1512(c)(2), 2).

## IV.    STATUTORY PENALTIES

Foy now faces sentencing for Obstruction of an Official Proceeding in violation of 18 U.SC. § 1512(c)(2) and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).

As noted by the Presentence Report, Foy faces up to 8 years in prison for a violation of 18 U.S.C. § 111(a)(1) and up to 20 years in prison for a violation of 18 U.S.C. § 1512(c)(2). He is also subject to a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

That Guidelines analysis follows:

Count Two (Superseding Indictment): 18 U.S.C. § 1512(c)(2):

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[4] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[5] | +3 |
| USSG §3A1.2(c)(1) | Official Victim | +6 |
| | **Total** | **31** |

Count One (Superseding Information): 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[6] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

| | |
|---|---|
| **Combined Offense Level** | **31** |
| Acceptance of responsibility (U.S.S.G. §3E1.1(a) and (b)) | -3 |
| **Total Adjusted Offense Level:** | **28** |

Because Foy's violent Section 111 offense embodied conduct that served as the basis for the 8-level enhancement under U.S.S.G. § 2J1.2(b)(1)(B) for Section 1512, those two counts group. *See* U.S.S.G. § 3D1.2(c). Section 1512, which has the higher base offense level, provides the base

---

[4] The government submits that U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense involved "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

[5] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2),

[6] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

offense level for the grouped Counts. *See* PSR ¶ 41 (citing U.S.S.G. § 3D1.3(a)).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because of Foy's use of violence in the assault against the officers in the LWT Tunnel. See U.S.S.G. § 4C1.1(a)(3) (adjustment applies only if "the defendant did not use violence or credible threats of violence in connection with the offense"). Foy's conduct, aimed towards at least two officers, involved the weaponized use of a sharpened metal pole (thrown like a spear) and a hockey stick. Both of these items constitute dangerous weapons as defined in 1B1.1.

In several cases, other judges of this Court have defined "violence" as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm," or as the "exertion of any physical force so as to injure or abuse." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ---F.Supp. 3d---, 2024 WL 324234 at *2 (D.D.C. Jan. 9, 2024); *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (same). Here, Foy unlawfully shoved a police officer with sufficient force to knock her to the ground. The shove was also accompanied by fury and vehemence, as evident from the act itself and by Foy's additional attacks that included strikes against Officer A.W. when that officer was already injured and prone on the ground.

The U.S. Probation Office calculated Foy's criminal history as category I, which is not disputed. PSR ¶ 57. Accordingly, based on the government's calculation of Foy's total adjusted

offense level, after acceptance of responsibility, at 28, Foy's Guidelines imprisonment range is 78 to 97 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Foy's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Foy knowingly came to the Capitol with the intent of disrupting the official certification of the Presidential election. And he did so in a violent manner, storming the grounds and assaulting police officers in the LWT with a sharp metal pole and a hockey stick. The nature and circumstances of Foy's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 97 months.

### B.  Foy's History and Characteristics

Foy's personal characteristics do not distinguish him from many of the rioters on January 6, 2021. First, Foy is a former military officer. Foy's military service is commendable. But it also makes his attack on police more shameful. His training and service should have instilled a respect for police, but that was not the case on January 6, 2021. If anything, his military background made him more dangerous and effective at the LWT, guiding his assault on police. That violence was a betrayal to the country he vowed to protect and it was directed at Americans who had made similar

vows to serve their country and protect their nation's Capital. He has no excuse for his actions on that day.

Second, the PSR suggests that Foy suffers from a variety of mental health issues, namely ADHD, depression, and PTSD. The government does not wish to minimize the seriousness of these conditions. However, they are not defenses to Foy's conduct. These conditions did not stop Foy from traveling to Washington, D.C. on January 6, 2021. He remained in control of his faculties and he repeatedly decided to be part of the violence. He chose to walk to the Capitol, to enter the grounds, to climb to the LWT, to assault police officers, and to enter the Capitol building. He understood his crimes.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Foy's criminal conduct on January 6 was the epitome of disrespect for the law. It is hard for any sentence to adequately grasp the scope of what occurred during the Capitol Siege. It was an event without precedent in the history of the nation. As such, the sentence in this case must reflect that Foy's violence was not only directed at individual officers. It was directed at, and was a rebuke of, the American constitutional system.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Although Foy has a criminal history category of I, his conduct towards police on January 6, 2021 was extraordinarily violent. *See* Section VI(B) *supra.* He threw a sharpened metal pole at police before attacking other officers with his hockey stick. To the government's knowledge, Foy has yet to demonstrate any remorse for his actions on January 6, 2021.  Lack of remorse does not bode well for a defendant's willingness to avoid similar criminal conduct in the future.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.      **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9] Although all the

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other

other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Few cases have matched the circumstances of Foy's case in terms of the charges and the severity of the violence at issue. But in each similar case, the Court imposed a guideline sentence due to the nature of the defendants' assaults and the gravity of the January 6, 2021 riot, even when the defendants pointed to strong mitigating facts in their favor.

One such analogous case to Foy is *USA v. Thomas Robertson* 1:21-CR-00034 (CRC). In *Robertson,* a police sergeant attempting to stop the certification of the electoral college vote assaulted police officers with a wooden stick before entering the Capitol building. Both men were military veterans with a category I criminal history who brandished a dangerous weapon at police. However, Robertson merely brandished his wooden pole at officers while blocking and interfering with the MPD officers who were trying to move through the crowd on the West Front of the building. In this Robertson aided and abetted rioters immediately around him who were threatening and assaulting these officers. Due to an aggravating factor relating to his destruction of evidence, Robertson had an offense level of 29. Accordingly, his guidelines range was 87 to 108 months of

Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

incarceration, and he was ultimately sentenced to 96 months in prison. Unlike Robertson, Foy himself assaulted multiple police officers with dangerous weapons on January 6th. As a result, it would be appropriate for his sentence to be at the high end of the guideline range at 97 months.

*U.S. v. Craig Bingert* 1:21-CR-00091 (RCL) provides another appropriate comparison for Foy's sentencing. Bingert, with an accomplice, climbed the inaugural scaffolding before he grabbed the metal bike rack in front of them and pushed it hard against the police, resulting in injury to at least one officer. Like Foy, Bingert cheered on the advancement of other rioters and battled against a west side police line with an unconventional, but dangerous, weapon. And again, like Foy and Robertson, Bingert was a category I defendant. Eventually, Bingert was sentenced to 96 months in prison, which would be at the upper edge of the sentencing range.

In *United States v. Albuquerque Head*, 1: 21-cr-291, the defendant, who had a substantial criminal history, used a stolen police riot shield to press his weight against police officers on the front line near the entrance of the LWT, forcing them backwards. MPD Officer Michael Fanone was one of the officers trying to keep Head and his fellow rioters from advancing into the tunnel. Head wrapped his arm around Officer Fanone's neck and yelled to his fellow rioters, "I've got one!" Head forcibly dragged Officer Fanone into the riotous mob, isolating him as the crowd violently assaulted the officer. Head continued to restrain Officer Fanone while another rioter applied a taser to the base of the officer's skull. Head repeatedly grabbed at Officer Fanone until one of Fanone's protectors among the rioters forcibly pushed Head away. Based on Head's guilty plea to one count of violating 18 U.S.C. § 111(a), Judge Berman Jackson sentenced Head to 90 months' incarceration.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But as Foy was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

23

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Because Foy engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Foy responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Foy to pay $2,000 in restitution for his convictions on Counts One and Two. This amount fairly reflects Foy's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 97 months.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    *s/ Emory V. Cole*
EMORY V. COLE
Assistant United States Attorney
PA Bar No. 49136
United States Attorney's Office

25

For the District of Columbia
601 D. Street, NW
Washington, D.C. 20530
Emory.Cole@usdoj.gov

MATTHEW BECKWITH
DC Bar No: 90014452
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20004
(202) 252-7109
Matthew.Beckwith@usdoj.gov