```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        .
                                 .
          Plaintiff,             .   CR No. 21-0108 (TSC)
                                 .
     v.                          .
                                 .
MICHAEL JOSEPH FOY,              .   Washington, D.C.
                                 .   Wednesday, February 28, 2024
          Defendant.            .   10:16 a.m.
. . . . . . . . . . . . . . . .
```

```
                  TRANSCRIPT OF SENTENCING HEARING
              BEFORE THE HONORABLE TANYA S. CHUTKAN
                   UNITED STATES DISTRICT JUDGE
```

**APPEARANCES:**

| | |
|---|---|
| For the Government: | MATTHEW M. BECKWITH, AUSA |
| | EMORY V. COLE, AUSA |
| | U.S. Attorney's Office |
| | 601 D Street NW |
| | Washington, DC 20530 |
| | |
| For Defendant: | ELIZABETH K. MULLIN, AFPD |
| | EUGENE OHM, ESQ. |
| | Federal Public Defender Office |
| | 625 Indiana Avenue NW |
| | Suite 550 |
| | Washington, DC 20004 |
| | |
| Court Reporter: | BRYAN A. WAYNE, RPR, CRR |
| | U.S. Courthouse, Room 4704-A |
| | 333 Constitution Avenue NW |
| | Washington, DC 20001 |

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, this is criminal case 21-108, United States of America versus Michael Foy.  Parties, please come forward to the lectern and identify yourselves for the record, starting with the government.

MR. BECKWITH:  Your Honor, on behalf of the United States, AUSA Matthew Beckwith.

THE COURT:  Good morning.

MR. COLE:  Good morning, Your Honor.  I am Emory V. Cole.  I'm representing the United States along with AUSA Beckwith.  Nice to see you again, as always.

THE COURT:  Good morning, Mr. Cole.  Always nice to see you.

MS. MULLIN:  Good morning, Your Honor, Elizabeth Mullin and Eugene Ohm on behalf of Michael Foy.

THE COURT:  Good morning.  Good morning, Mr. Foy.

PROBATION OFFICER:  Good morning, Your Honor.  Jessica Reichler on behalf of the United States Probation Office.

THE COURT:  Good morning.

All right.  We are here for the sentencing of Mr. Foy.  Mr. Foy is probably my second January 6 case?  It was one of the early ones, and it has been a long road.  And I am really happy to see that you have done so well on release, Mr. Foy.

You remember that I reluctantly -- you were detained pending trial -- over strenuous objection of the government

and extremely zealous and effective advocacy by Ms. Mullin,
I did release you because I believed, and I still believe, the
statute required me to do so.  And I warned you at the time that
if you even so much as got a parking ticket that I would revoke
your conditions of release.  And you did not.

You have performed extremely well.  You have turned your
life around, and you are in a good place now.  And regardless
of what happens today, you should be proud of yourself for where
you are today.  This makes this proceeding extremely difficult,
but I just want to commend you for that and acknowledge where we
are from the last time we saw you, which was in the D.C. jail.

All right.  Mr. Foy, after a stipulated trial on June 22
of last year, was found guilty of Obstruction of an Official
Proceeding and Aiding and Abetting, in violation of 18 U.S.C.
Sections 1512(c)(1) and (c)(2), and Assaulting, Resisting, or
Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).

In preparation for today's sentencing, I have received and
reviewed the presentence report, the sentencing recommendation,
both from the probation department, and the following materials
submitted by counsel in advance of the hearing: the statement of
offense for the stipulated trial that was signed by Mr. Foy; the
motion to stay sentencing pending *Fischer*, which I've denied;
the government's sentencing memorandum and corresponding video
evidence; the defendant's sentencing memorandum and supplements;
and the latest pretrial compliance report, which was filed on

1    February 26.

2        So, Mr. Cole, are you -- have you moved the video exhibits

3    into evidence?  You used them before in the bond review hearing.

4    Are you planning to move them into evidence?  Are they already

5    in evidence?

6        MR. COLE:  With agreement, Your Honor, and AUSA

7    Beckwith is going to make the initial --

8        THE COURT:  Okay.  Mr. Beckwith?

9        MR. BECKWITH:  Yes, Your Honor.  Without objection

10   from the defense, we'd like to move in all six of the video

11   exhibits as well as the photographs that were used in the

12   sentencing memorandum.

13       THE COURT:  All right.  They'll be accepted into

14   evidence.  And, Mr. Beckwith, since we don't have a jury here,

15   you may stay at counsel table during this proceeding except for

16   allocution.  Just make sure you have the microphone pulled up

17   to you and that it's on.

18       MR. BECKWITH:  Yes, Your Honor.

19       THE COURT:  Thank you.

20   Okay.  Let me first begin with the presentence report.

21   And I did speak with Probation this morning regarding certain of

22   the disputes regarding the sentencing guidelines and the range,

23   and I'll relate those conversations in a moment.  The final

24   presentence report and sentencing recommendation were filed in

25   this matter on February 21, 2024.

1          Who's handling the sentencing?  Is that you, Ms. Mullin?

2              MS. MULLIN:  Yes, Your Honor.

3              THE COURT:  Well, let me start with Mr. Beckwith.

4      Are you handling the sentencing?

5              MR. BECKWITH:  Yes.

6              THE COURT:  Do you have any objections to any of

7      the factual recitations set forth in the presentence report?

8              MR. BECKWITH:  No, Your Honor.

9              THE COURT:  All right.  Ms. Mullin?

10             MS. MULLIN:  No, Your Honor.

11             THE COURT:  All right.  Hearing no objection -- oh,

12     and are you planning on having an evidentiary hearing or any

13     witness statements?

14             MR. BECKWITH:  No, Your Honor.

15             THE COURT:  All right.

16     Mr. Foy, are you fully satisfied with your counsel, Mr. Ohm

17     and Ms. Mullin, in this case?

18             THE DEFENDANT:  Yes, I am, Your Honor.

19             THE COURT:  Do you feel that you've had enough time

20     to talk to your attorneys about the probation department's

21     presentence report and the papers that have been filed in

22     connection with your sentencing?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  Ms. Mullin, have you and Mr. Foy gone

25     over, read, and discussed the presentence report?

1          MS. MULLIN:  Yes, Your Honor.

2          THE COURT:  All right.  And as you said, you have no

3     disputed factual issues.  Therefore, hearing no objection, I

4     will accept the factual recitation set forth in the presentence

5     report regarding the circumstances of the offense, and therefore

6     the facts as stated in the presentence report will be my

7     findings of fact for the purpose of this sentencing.

8          All right.  Let's talk about the guidelines.  And I am

9     aware of the pending *Fischer* decision in the Supreme Court.

10    The defense opposes the use of sentencing guideline §2A2.2

11    for the charge of Assaulting, Resisting, or Impeding Certain

12    Officers, which is 18 U.S.C. § 111(a)(1), and the use of

13    sentencing guideline §2J1.2 for the offense of Obstruction

14    of an Official Proceeding and Aiding and Abetting.

15         The defendant notes that the conduct does not involve the

16    administration of justice as found in *United States v. Seefried*.

17    The defense cites *United States v. Fischer,* which, as I said,

18    is pending before the Supreme Court, as cause for the court to

19    decline to apply the obstruction guideline under §2J1.2, and it

20    argues that the guideline for the assault count should actually

21    be §2A2.4.  In their sentencing memorandum, they argue that the

22    appropriate sentencing range is 8 to 14 months.  Obviously, the

23    government disagrees with that.

24         The probation office determined the applicable guidelines

25    based on the provisions in §1B1.2, which directs the use of

the Chapter 2 guidelines section in the statutory index for the

offense of conviction.  To date, the Supreme Court in *Fischer*

remains pending.

As to the applicable guideline for Assaulting, Resisting,

or Impeding Certain Officers, the defendant's conduct, which

involved the defendant assaulting Metropolitan Police Department

officers in the face, head, neck, and body with a hockey stick,

as well as throwing a metal pole at a line of law enforcement

officers, fits squarely within the §2A2.2 guideline.

This assaultive conduct cannot be -- at least will not

be by this court -- characterized as mere obstructing or

impeding officers, and therefore no changes were made to the

report, and I do find that that applies.

Now, I did speak with the probation office about this since

it is a tricky issue.  And I will tell you that even though I

find that the enhancement does apply, the assaultive conduct,

Assaulting, Resisting, or Impeding Certain Officers applies,

ultimately the disposition of *Fischer* will not have a effect on

my decision because it is my intent to go below the guidelines

in this case based on other factors in this case.

So, regardless of what ultimately happens in *Fischer*, that

would not affect the sentence that -- even though I'm applying

the enhancement for a guidelines level, which defense objects

to, I intend to go below that guideline level.

The defense also contends that a downward departure should

be applied under §5K2.13, which is diminished capacity, and
guideline §5H1.11, military service.

Probation disagrees and states that "a diminished capacity
departure," they find, "is not applicable because, as stated
under the guideline, 'The Court may not depart below the
applicable guideline range if [2] the facts and circumstances
of the defendant's offense indicate a need to protect the public
because the offense involved actual violence or a serious threat
of violence.'

"In this case, the defendant assaulted a law enforcement
officer and attempted to assault additional officers when he
threw a metal pole at them.  Therefore, on this basis alone,
it does not appear this departure provision is applicable.

"With respect to the defendant's military service, the
applicable guideline, §5H1.11, notes the military service,
individually or in combination with other offender characteristics,
is present to an unusual degree and distinguishes the case from
the typical cases covered under the guidelines.  While this is
not included as a departure recommendation under this provision,
it was noted as a potential variance consideration under 18
U.S.C. § 3553."

And I intend to consider it as a potential variance
condition, but I do not intend to apply a downward departure
because of it.  Therefore, I'm going to overrule the defendant's
objections and agree with the probation department's position in

the presentence report.

Both of Mr. Foy's felony offenses are based on conduct
that the guidelines state the court should not depart from.
Given the metal pole and the hockey stick used repeatedly to
assault an officer and those protecting the Capitol on January
6, the diminished capacity provision, §5K2.13, should not apply.

Further, as to military service, the presentence report
indicates on page 27 that the probation office has identified
that as a factor that may warrant a variance that I will
consider at that time.

Per §5H1.11 it states, "Military service may be relevant
in determining whether a departure is warranted if the military
service, individually or in combination with other offender
characteristics, is present to an unusual degree and distinguishes
the case from the typical cases covered by the guidelines."

I would note that Mr. Foy served four years in the
military, two of which he was deployed in Japan.  He experienced
severe hazing and serious posttraumatic stress disorder and
trauma from the experience and has been coping with that ever
since.  I will take that factor into account at sentencing as a
possible variance.

With regard to the sentencing options under Count 1,
Assaulting, Resisting, or Impeding Certain Officers, in
violation of 18 U.S.C. § 111(a)(1), per the statutory provision,
the maximum term of imprisonment is eight years for this Class D

felony.  Under Count 2, Obstruction of an Official Proceeding
and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2)
and 2, the maximum term of imprisonment is 20 years for this
Class C felony.

Per the presentence report, the counts group together
under sentencing guideline §3D1.2 because the assault on the
officer is treated as a specific offense characteristic under
§2J1.2(b)(1)(B), which is threatening to cause physical injury
to a person in order to obstruct the administration of justice.

Under sentencing guideline §3D1.3, for counts grouped
together under sentencing guideline §3D1.2(a) to (c), the
offense applicable to a group is the offense level which produces
the highest offense level, which would be the Obstruction of an
Official Proceeding and Aiding and Abetting charge, in violation
of 18 U.S.C. § 1512(c)(2).

The guideline for this offense is found in guideline §2J1.2
and provides that the base offense level is 14.  Because the
offense involved threatening or causing physical injury to a
person in order to obstruct the administration of justice, eight
levels are added under §2J1.2(b)(1)(B).

Because the offense resulted in substantial interference
with the administration of justice, three levels are added under
§2J1.2(b)(2).  And because Mr. Foy created a substantial risk of
serious bodily injury, knowing or having reasonable cause to
believe that the Metropolitan Police Department officer was

law enforcement during the course of the assault, a six-level
increase is added under sentencing guideline §3A1.2(c)(1).
This is an adjusted offense subtotal level of 34.

However, because Mr. Foy has clearly demonstrated an
acceptance of responsibility, the offense is decreased by two
levels under sentencing guideline §3E1.1(a).

Now, Mr. Foy did not enter a plea pursuant to a plea
agreement; he entered into a stipulated trial.  Does the
government object to the two-level reduction for acceptance
of responsibility?

MR. BECKWITH:  No, Your Honor.

THE COURT:  All right.  I'm going to give the
two-level reduction for acceptance of responsibility.
I think it's warranted in this case.

This decreases his offense level to 28, the total offense
level to 28.  And because Mr. Foy has zero criminal history, a
sentencing guideline table establishes that he has a criminal
history category of I.

Now, I know -- first of all, let me start with you,
Mr. Beckwith.  Any objection so far to my calculation of the
offense level?

MR. BECKWITH:  No, Your Honor.

THE COURT:  I know, Ms. Mullin, that there is a
standing objection from the defense based on my application
of the enhancements.  Is that correct?

1           MS. MULLIN:  Yes, Your Honor, and those are all

2     set forth in our sentencing memorandum.

3           THE COURT:  All right.  Well, your objection is

4     preserved for the record.

5           All right.  The guidelines provide that, based on a total

6     offense level of 28 and a criminal history category of I, the

7     imprisonment range is 78 to 97 months.  The maximum the court

8     may impose is 96 months, and it is up to the court to determine

9     the total punishment on each count.

10          Under guideline §5G1.2(b) and (c), if the sentence imposed

11    on the current count carrying the highest statutory maximum is

12    adequate to achieve the total punishment, then the sentences on

13    all counts shall run concurrently except to the extent otherwise

14    required by law.

15          Regarding supervised release, the statute provides that the

16    court may impose a term -- well, 18 U.S.C. § 3583(b)(2) provides

17    that I may impose a term of no more than three years and that

18    multiple terms of supervised release shall run concurrently.

19    The guidelines indicate that, because counts 1 and 2 are Class C

20    and D felonies, the term of supervised release is one to three

21    years.

22          As to probation, 18 U.S.C. § 3561(c)(1) states that the

23    defendant is eligible for not less than one nor more than five

24    years of probation given the class of his felony offenses.  A

25    fine, restitution, or community service must be imposed as a

condition of probation unless extraordinary circumstances exist.
However, because the applicable guideline range is in Zone D of
the sentencing table, Mr. Foy is ineligible for probation under
guideline §5B1.1, Commentary Note 2.

The maximum fine per count is $250,000.  As per the
guidelines, the fine range is $25,000 to $250,000.  A special
assessment of $100 per felony count, for a total of $200, is
mandatory.

As to restitution, 18 U.S.C. § 3663A indicates that
restitution shall be ordered in this case to be paid to the
Clerk of the Court, who will forward the payment to the
Architect of the Capitol.  The guidelines also indicate that
restitution shall be ordered.

Counsel, have I stated accurately the guidelines framework
and the statutory framework under which we're operating?

MR. BECKWITH:  Yes, Your Honor.

MS. MULLIN:  Yes, Your Honor.

THE COURT:  Okay.  Now, as you all know because you've
received this, I'll just put on record that the probation office
has recommended a sentence in this case.  Taking into account
all the statutory factors, probation office recommends a
sentence of 72 months — that is six years of imprisonment —
to be served concurrently, 24 months — that is two years — of
supervised release to be served concurrently, a restitution to
be determined by the court, and $200 special assessment, which

is mandatory.  The recommendation of Probation is not based on any facts and circumstances that have not already been revealed to the parties in the presentence report.

So at this time I'm going to allow the parties an opportunity to address the court.  And, Mr. Beckwith, are you doing this?

MR. BECKWITH:  Yes, Your Honor.

THE COURT:  All right.  You can come on up.  I want to start by asking you -- I've reviewed the sentencing memorandum, and I have to tell you, although I have the greatest respect for Mr. Cole and your office, I am a little perturbed by your sentencing memorandum in this case.  It was very thin.

The defense has done a remarkable job in the sentencing materials that they have provided me, indicating a great deal of support and documentation for Mr. Foy's mental health issues, which are well established, as well as the circumstances under which he was living, his lack of prior criminal history and so forth.

What I got from the government was a very conclusory sentencing memorandum, basically, simply restating the facts of the case and Mr. Foy's actions in the case, of which I am well aware.  And I have to tell you, I had the same problem with the bond review motion, which is all I get, is an emphasis on his conduct, which is serious and which is what brought him here, but there are a host of other factors that I have to consider under § 3553(a).

1    I find that the government's sentencing memorandum gives

2    very short shrift to these factors that I have to consider.  I

3    can't just -- I'm being asked to sentence an individual, not an

4    offense.  And while I do take seriously -- I don't think anybody

5    could say I don't take seriously the conduct with which he's

6    charged, I have to take more than that into consideration.  And

7    I find that the government's sentencing memoranda has given me

8    very little to work with.

9        I mean, you asked for a fine -- in the very first

10   paragraph, you ask for a fine of $88,464.  Where do you get

11   that number from?  It doesn't say anywhere in here where the

12   government arrived on that fine number.

13           MR. BECKWITH:  No, Your Honor.  In the amended

14   version, there was no fine.  What we filed -- we filed an

15   amended version that had that number eliminated.

16           THE COURT:  Hold on.  Let me look.

17       I don't see it.  When did you file the amended version?

18           MR. BECKWITH:  Several days later.

19           MR. COLE:  February 15, Your Honor, Document 93.

20   We made the adjustment, Your Honor.

21           MR. BECKWITH:  And we had spoken to defense counsel,

22   and they filed it without opposition.

23           THE COURT:  Hold on.  Let me talk to my law clerk

24   about it, because I took this home with me last night.

25           (Court conferring.)

1          THE COURT:  Okay.  I don't have it.  I'm sorry.

2    I didn't get it.  So you've taken that out?

3          MR. COLE:  We did.

4          THE COURT:  Okay, good.  I'm glad to hear that because

5    I wasn't going to give that.  Were there other amendments to it?

6          MR. COLE:  That was it.

7          THE COURT:  That's what I thought.  All right.  And

8    then the mandatory $100 is actually $200 special assessment.

9    Are you asking for the standard $2,000 restitution as other

10   defendants have agreed to do in cases where there was a plea

11   agreement?

12         MR. BECKWITH:  Yes, Your Honor.

13         THE COURT:  All right.  So I'll let you go.  You can

14   proceed.  I'm glad we cleared that up because that raised my

15   eyebrows.  Okay.

16         MR. BECKWITH:  I'm just plugging in my laptop, waiting

17   for it to appear.

18         THE COURT:  Sure.

19      (Exhibit displayed.)

20         MR. BECKWITH:  Can Your Honor see that?

21         THE COURT:  I can.  Thank you.

22         MR. BECKWITH:  Great.

23      Your Honor, Mr. Foy's conduct merits the strongest

24   punishment within the appropriate guidelines range as calculated

25   in this case.  That would be 97 months' incarceration, three

1   years of supervised release, $2,000 in restitution, and the

2   mandatory $200 special assessment.

3   This is based on several factors.  The first is Mr. Foy's

4   participation in the riot that attempted to obstruct the 2020

5   presidential election, the severity of the two separate

6   instances of violence against the police, and finally his

7   decision to enter into the Capitol building after his assaults

8   on law enforcement.

9   Mr. Foy was amongst the most violent actors at the Capitol

10  that day, and we ask the court to recognize the need for broad

11  deterrence, for a sentence that acknowledges the severity of

12  the offenses and the antidemocratic violence that occurred

13  within.

14  As this court is well aware, January 6 was a stain on the

15  nation's history.  And at that riot, and especially at the

16  tunnel, there was intense violent assault.  Capitol Police

17  Sergeant Gonell, who was there that day, compared it to a

18  medieval siege.

19  On the morning of January 6, Mr. Foy traveled alone from

20  his home in Michigan to D.C. to attend President Trump's Stop

21  the Steal rally.  Mr. Foy believed that the 2020 election had

22  been stolen and that he planned to demand that Congress block

23  the certification of the vote.

24  He was dressed in a camouflage jacket and hat and wore

25  a large American flag around his shoulders, and he carried a

"Trump 2020" flag.  The flag was attached to a hockey stick,
as you can see in the photos on the screen.

     And Mr. Foy began his march to the Capitol at approximately
2 p.m. as part of a large crowd.  As part of that crowd, he moves
through the Peace Circle, he stepped over toppled bike racks and
ignored the cacophony of screams and tear gas that were happening
on the west side at that point.  And through the mob, he moved
to the inaugural stage scaffolding with the other rioters, and
by 4 p.m. he had moved to the Lower West Terrace.

     By 4:25, Mr. Foy was at the mouth of the Lower West Terrace
tunnel, and the next two minutes will contain a terrible wealth
of violence.  As you can see on your screen, Mr. Foy, circled in
red -- and I want to draw your attention to several points in,
and the first is -- and you'll see this in the video, but I just
want to provide context because I know a lot of these videos are
very kinetic and chaotic.

     First is that, while things were chaotic, there was actually a
pause in the violence at this point.  The siege-like atmosphere
had temporarily halted, and you can see that officers had pushed
many of the rioters out of the tunnel.  There were many rioters
leaving with their backs turned.

     And once he had moved through the crowd, Mr. Foy found this
sharpened metal pole on the ground, and he picked it up and he
threw it almost like in a spear-throwing or a javelin-throwing
motion, over the heads of rioters into the body of a police officer.

1      (Video played.)

2          And I want to highlight that the force of that throwing

3      pole did knock the officer back into the side of the tunnel.

4      And had he not been wearing protective body armor, that could

5      have resulted in real damage to his torso or internal organs.

6          And now in the next portion of the video, you will see the

7      assault with the hockey stick.  And I want to -- I'll play that

8      from a few different angles to sort of highlight what occurred

9      in that moment.

10         But, again, there was a lull in the violence, and then two

11     other rioters moved forward, one with a large, gnarled stick,

12     and they actually began the initial attack.  And their names

13     were -- this is public -- Jonathan Mellis and Justin Jersey, and

14     they lunged over an unconscious rioter at approximately 4:26 p.m.

15         Mr. Foy was standing directly behind them, could see what

16     they were doing, and it was after Mr. Mellis leapt over the

17     unconscious rioter and began stabbing at officers that Mr. Foy

18     moved within striking distance of the mouth of the tunnel and

19     began his attack.  There were at least 11 strikes with violent

20     force over the course of 16 seconds.  His victims included

21     several officers falling to the ground, including Officer D.P.,

22     to whom the statement of offense refers to.

23         (Video played.)

24         Your Honor, as you can see from that clip, at the moment

25     that Mr. Mellis leaps forward, and with Mr. Foy's attack on the

1    police officers with his hockey stick, pandemonium once again

2    reemerged, and there was once again really serious violence

3    against law enforcement.

4         We now have another exhibit that's going to show that scene

5    from a different angle, where you can see farther into the

6    tunnel.  And I would just remind the court that Mr. Foy will

7    be at the left side of the tunnel's opening; and you'll see the

8    hockey stick, and he has his parka hood up.

9         (Video played.)

10        And that explosion of violence, as you see, it was not just

11   a hockey stick sort of wielded in a slashing or chopping motion.

12   It was also batons, a metal crutch, bare fists, wooden stick,

13   chemical spray.  It was an extraordinary act of violence against

14   law enforcement that occurred at the mouth of the tunnel.  And

15   we have the body-worn footage from two of the officers that were

16   standing at the mouth of the tunnel and were subjected to

17   Mr. Foy's attacks.

18        The first is the body-worn camera of Officer A.W.  And you

19   can see in these sort of screenshots that Mr. Foy is circled in

20   the left.  He's standing directly behind Mr. Jersey and

21   Mr. Mellis.  And you can see that he'll have -- apparently have

22   a clear line of sight to the initial leaping of the violence.

23   And then later, after Officer A.W. had been knocked to the

24   ground, you can see from the image on the right Mr. Foy chopping

25   downwards at the officer with his hockey stick.

1      And this is just another image of that sort of downward

2   chopping, and you can appreciate the sort of perspective and the

3   vulnerable position that the officers were in at this moment.

4      (Video played.)

5      Officer A.W. was the officer that Mr. Mellis encourages

6   Mr. Jersey to attack in this video.  You can hear him say,

7   "Knock their masks off."  And we see that Mr. Foy immediately

8   attacked afterwards, contributing to sort of that pandemonium

9   that you experienced.

10     And officer A.W., in that pandemonium, his helmet was

11  knocked off, his baton was stolen, he was further assaulted by

12  members of the mob, and he was dragged down steps into the crowd

13  of rioters.  And he was ultimately treated for lacerations to

14  his head, which required two stitches to close, and he sustained

15  bruising throughout his body.  And due to his injuries, he was

16  off duty until May 2021 and couldn't return to full duty until

17  July 2021, approximately six months later.

18     This next clip, it's another angle of the attack.  It's

19  open-source video, and it provides -- and you'll see Mr. Foy

20  at the mouth of the tunnel with his hood and his hockey stick

21  again.  And you can see the officers lying prone in the tunnel

22  and sort of appreciate what they're being subjected to by

23  Mr. Foy with his downward chopping strikes.

24     (Video played.)

25     It's a -- that's it.  It's a brief clip.

And the next body-worn camera we'd like to show is Officer D.P.'s body-worn camera.  She was one of the officers lying from this angle inside against the railing.  And the opening of this body-worn camera footage captures the moment that Mr. Foy's hockey stick was knocking her to the ground in a defensive posture.  It's a very chaotic sort of loud, shaky video, but I think you can appreciate the ferocity of the attack.  But if at any point you want me to stop or replay a portion, I'm happy to.

And -- oh.  And this is simply a screenshot from this body-worn camera footage that's about to occur, where you can see Mr. Foy sort of swinging his hockey stick at this officer.

(Video played.)

In the statement of offense, Mr. Foy admitted that he was not acting in self-defense or in the defense of others when he was using the hockey stick to assault Officer D.P. in her head, neck, and body area.

Other officers on the ground can be seen in those videos, and they've been knocked backwards.  By this point in the day, they were already tired from having to defend the tunnel for a few hours, and they're holding their arms over their head, shielding themselves the best they can from the blows of the crowd and from Mr. Foy.

The next exhibit we'd like to show is that, immediately after this attack on law enforcement, Mr. Foy yelled "Let's go" to other rioters while pointing at the Capitol building.  This

1    is approximately 4:29 p.m.  And at this point Mr. Foy gained

2    entry to the Capitol building through a shattered window.  You

3    can see him in these two images, circled, how he crawled in

4    through the window, and we can show that clip from open-source

5    video here.

6           (Video played.)

7           Photos taken from Mr. Foy's cell phone that day captured

8    rioters standing inside the Capitol, and this is one of those

9    photos.  We can see glass on the carpet, tables overturned, and

10   the evident destruction within.  And I think it's also notable

11   that immediately after the two attacks on law enforcement,

12   Mr. Foy did not stop with regret.  He actually said "Let's go"

13   and sort of continued into the building.

14          And for each of these factors, that's why we believe that

15   the strongest sentence within the calculated guideline range is

16   appropriate.  As Your Honor knows, there is need for the 3553(a)

17   factors, but Mr. Foy -- for several reasons, we believe that

18   Mr. Foy deserves these.

19          First off, it's the violence of the conduct itself.

20   There's the fact that he is a former military officer, and

21   the assault that was perpetrated was against law enforcement.

22   These are law enforcement officers who had taken a duty to

23   protect and serve.

24          The government does not wish to minimize the seriousness of

25   Mr. Foy's mental health conditions, but those are not adequate

defenses here because they did not -- he was in full control
of his faculties.  He made the decision to come to Washington,
D.C., to attend the rally.  He made the decision to enter the
Capitol grounds, to climb to the Lower West Terrace, to throw a
sharpened pole at officers, to assault officers with a hockey
stick, and he made the choice to enter the Capitol building.

And on the more general level, all January 6 cases are an
opportunity to send society a message that this behavior is a
threat to a functioning democracy.  There's a fragility to
precious things, and it's important that we show a commitment
to values of rule of law and democratic rule through each one of
the January 6 sentencings.

We believe the cases that we cite to are consistent with
the sentence we recommend.  Each of these cases involves
appropriate charges for the severity of violence against a
police officer, and they were all tunnel cases, which is notable
because the Capitol is a large complex, but it's the specific
events of the tunnel that day that were so uniquely violent.

And furthermore, we believe that the cases the defense
relies on have fact patterns and situations that are
inconsistent with the situation --

THE COURT:  You're asking me to give a sentence at
the top of the guidelines range of 97 months.  You've used as
comparators -- and you know I am not going to sit here and
disagree with any characterization of the violence that occurred

1   that day.  But you're asking me to give a sentence at the top

2   of the guideline range to an individual who not only had no

3   criminal record but who was honorably discharged from the

4   military, and who has, since I reluctantly released him,

5   followed every single condition of his pretrial release for

6   two years.  And yet you're still asking me to give him 97

7   months, the top of the guideline range.

8       Mr. Albuquerque Head got 90 months, with extensive criminal

9   history, for conduct that was arguably more violent than

10  Mr. Foy's.  Not that I'm diminishing Mr. Foy's conduct in any

11  way.  Ninety-seven months?  I find that a little hard to justify.

12  I mean, why is he at the top of the range and gets no concession

13  for his lack of criminal record?

14          MR. BECKWITH:  Well, the top of the guidelines range

15  we feel is appropriate simply due to the specific instance at

16  hand.  The other factors, the life before or life since --

17          THE COURT:  But I have to consider all the Section 3553

18  factors.  What you're arguing here is -- and appropriately so --

19  is the seriousness of the offense, and I won't disagree with you

20  on that.  But I have to consider all the 3553 factors, the

21  history and characteristics of the defendant, the need for the

22  sentence to meet certain goals, a whole host of factors.  Not

23  just one.

24      All I'm seeing in your memoranda is the severity of

25  the offense.  And I can't just go on that, as concerning and as

1    troubling as it is.  So what I'm asking is, should Mr. Foy get

2    no concession for the other aspects of the other factors that

3    are set forth in 3553, his military service — that is, his

4    history and characteristics?

5         MR. BECKWITH:  Your Honor, it is the position of the

6    government that this would be an appropriate --

7         THE COURT:  I understand.  I'm just trying to figure

8    out why.  I gave Mark Ponder, Robert Palmer -- those are two of

9    the highest sentences I gave -- 63 months each time for very

10   violent conduct, on the same level as Mr. Foy.  Both those men

11   had significant criminal histories — significant — and were

12   older than Mr. Foy, and I should give Mr. Foy thirty something

13   months more than them?

14        MR. BECKWITH:  Your Honor, I don't know the facts of

15   those other cases --

16        THE COURT:  I know.  I know.  But I have to consider

17   disparity, right?

18        MR. BECKWITH:  I understand that.  I would say, in

19   these particular facts and circumstances, it is very fortunate,

20   if not just outright lucky, that someone wasn't far more

21   severely injured or --

22        THE COURT:  I totally agree with you.

23        MR. BECKWITH:  And it is that intensity of the

24   violence and the fact of the 1512 which is also at issue in

25   this case, and I don't know whether those other cases had 1512

1    situations.  But the 1512 here, the attempt to block the

2    certification of the presidential election is a serious factor

3    to consider, and there's a real sort of a threat to a general

4    deterrence that is needed in these situations because something

5    like this cannot be allowed to happen again --

6            THE COURT:  You're preaching to the choir on that

7    one, Mr. Beckwith.

8            MR. BECKWITH:  I'm sorry?

9            THE COURT:  I said you're preaching to the choir on

10   that one.

11           MR. BECKWITH:  Okay.  But for those reasons, we do

12   think that -- and certainly the way that in this case the hockey

13   stick was brandished as, you know, a serious weapon and, you

14   know -- I would say this:  That's the government's position.

15   I understand that the court is required to take in the full

16   3553(a) factors.

17       And like I said before, we're not -- the government does

18   not take lightly Mr. Foy's military service or his experiences

19   with mental health, but we believe in this situation, the 1512

20   being part of the plea as well the severity of violence, make a

21   97-month sentence appropriate.

22           THE COURT:  Thank you, Mr. Beckwith.

23           MR. BECKWITH:  Thank you, Your Honor.

24           THE COURT:  Ms. Mullin?

25           MS. MULLIN:  Your Honor, as a preliminary matter,

1   we would move in our video exhibits, Defendant's 1 and 4?

2         THE COURT:  Any objection, Mr. Beckwith?

3         MR. BECKWITH:  No, Your Honor.

4         THE COURT:  They'll be admitted.

5         MS. MULLIN:  And with permission from the court, we

6   would like to play Exhibit 1?

7         THE COURT:  Sure.

8         MS. MULLIN:  It's approximately a six and a half

9   minute video.

10        THE COURT:  Is there anything in this that needs to

11  be sealed?

12        MS. MULLIN:  No, Your Honor.

13      (Video played.)

14        MS. MULLIN:  Your Honor, Mr. Foy's history and

15  characteristics are set forth in the PSR and in our sentencing

16  materials.  As the court knows, he honorably served our country

17  as a Marine.  Mr. Foy was born and raised in Wixom, Michigan.

18  His biological father separated from his mother early in life,

19  and he did not know the man that his mother married was not his,

20  biological father until he discovered his biological father when

21  he was 18 years old.  He had a few meetings with his biological

22  father before his biological father passed away from ALS.

23      He lived in an area of Michigan where it was assumed that

24  one could have a solid, middle-class life working for the Ford

25  Motor Company, but just as Michael was graduating high school,

the plants across the region started to close.  And as set forth in our memorandum, the consequences of these closures on the economy and on families and on the community was devastating.

So the Ford job that had sustained the community for decades was no longer an option.  The Ford job that Michael's mother told him he would have was no longer an option.  After drifting a bit, Michael joined the Marines, fulfilling his longtime desire to serve his country.

While Michael honorably served his country, in retrospect, for someone like Michael, life in the Marines was uniquely challenging for him.  He felt inferior to the other Marines and was assaulted several times as part of a hazing.  In the Marines, he was diagnosed with depression, ADHD, and later, PTSD.

Now, when Michael returned from the Marines in 2019, it was a few months before the pandemic hit this country and his area of Michigan with gale force.  The two years between his return and January 6 were the worst two years of his life.  It is not an overstatement to say that he hit rock bottom.

Due to the pandemic, like millions of Americans who worked blue-collar jobs, he had a hard time finding a job.  He was not able to get an appointment at the VA to have his medication managed, so he had to go without the medication that had proved most efficacious for him.

Because we were all under isolation, he lived between his mother's home and his uncle's home, which was then basically an

abandoned construction zone.  He self-medicated by drinking,
as millions of Americans during the pandemic did.  He started
to cause harm to himself.  He even tried to take his own life.

Now, during this time, his mother and his stepfather
were ardent Trump supporters, while he was never particularly
political.  And as the election neared, he heard from his
family.  In the most dire terms, his family members would mimic
the bellicose, angry messages of then-President Trump.

When President Biden won the election and Mr. Trump and
his allies started spreading lies that were then rebroadcast on
local news stations, local radio stations, Facebook, so-called
news outlets, that there had been this rampant election fraud,
members of Michael's family, including his mother, with whom
he's had a very fraught relationship, became even more inflamed.

Meanwhile, Michael was sinking into a deeper and deeper
depression.  All around him, all he heard was about how America
was dying and only Trump could save America; everything was
going to hell.

In October of 2020 he went to the Veterans Administration.
He finally got an appointment and reported sleeplessness, despair,
and depression.  He went back again in December, just a few
weeks before January 6, and was prescribed a new medication
regime that he had never tried before and which clearly did not
work for him and is known to be associated with manic episodes.
That's all detailed in Exhibit 3, which was filed under seal.

1        On January 6, like so many nights before, he couldn't

2   sleep.  Without planning or without telling anyone, he jumped

3   into his car and grabbed a hockey stick to act as a flagpole.

4        THE COURT:  Let me stop you for a second, Ms. Mullin.

5   You've done an extremely effective job presenting sentencing

6   materials.  The defense characterizes Mr. Foy's decision to get

7   into his car with his hockey stick and his flag and drive to

8   Washington as a spur-of-the-moment, impulsive decision.

9        You sort of imply this he was not particularly political

10  other than hearing from his family, but the government provided

11  a photograph of Mr. Foy standing outside the building where the

12  Michigan electors were meeting.

13       Now, clearly, Mr. Foy has an absolute right to protest, and

14  was not violating the law in any way.  He was simply exercising

15  his First Amendment right to protest about what he believed was

16  a stolen election.  But that certainly seems to undercut your

17  point that this was some sort of spur-of-the-moment action.

18  Doesn't it?

19       MS. MULLIN:  Well, Your Honor, we would -- I

20  understand the tension in those two facts, and we tried to

21  address this in our papers.  He did -- we're not saying he

22  didn't succumb to sort of the propaganda, the dire propaganda

23  that was being --

24       THE COURT:  Well, "succumb" denotes a rather passive

25  role.  And I understand why you would want that to be the

portrayal, but the facts in the record and the evidence I've
been provided seems to indicate that it was a somewhat more
active role.

MS. MULLIN:  Yes, Your Honor.  He went to those two
rallies, or the one outside the electors building, with his
mother.  And he was -- you know, as he said to the psychologist,
he was kind of searching for a sense of connection, wanting to
be around people.  And, you know, we do not dispute that at that
time he had fallen for the lies and propaganda that America had
to be saved by President Trump and his allies.

With respect to January 6, while this was going on in the
background and with Michael, he had no prior plans to go to the
Capitol.  He didn't speak to -- so we're not saying that, you
know, all of a sudden he woke up on January 6 and was political.
This was something that had been percolating over time as he was
staying at his mother's house and hearing all of this rhetoric.
But the decision to go to January 6 came to him that night.

Of course, he had heard about January 6.  But he didn't,
for example, post "I'm going" or talk to his mom about it or
arrange for a ride or agree to go with a group of people.  He
woke up in the middle of the night and went.

So in that sense, it wasn't planned.  He didn't organize
with a group.  Again, he didn't tell anyone that he was going.
He didn't bring any provisions with him.  He didn't bring a
suitcase, a toothbrush, food, just his Trump flag and the hockey

stick to act as a -- and I know the court has expressed

skepticism about that.

THE COURT:  I have.  I have.  This isn't a hockey

town.  Caps fans might disagree with me, but come on.  He

brought a hockey stick to use as a weapon, and he used it as

a weapon.

MS. MULLIN:  We acknowledge that he used it as a

weapon, and we acknowledge even in our guidelines dispute that

he would receive a three-level enhancement for dangerous weapon.

But in terms of when he picked it up, I can tell you I'm from

Minnesota, which people often confuse with Michigan.  People

have hockey sticks everywhere.  It's a hockey state.  Minnesota

is a hockey state, too.  So what we dispute is the idea that he

picked up the hockey stick thinking it was going to be a weapon.

THE COURT:  Well, he certainly wasn't picking it up

thinking he was going to, like, get a game in.  He picked it

up because he needed something -- everybody knows you can't just

brings guns into the District of Columbia.  He brings a hockey

-- the hockey stick was not -- he wasn't planning to play hockey.

MS. MULLIN:  No.  We submit he was planning to -- and

this is what he said over and over again.  He was planning to

use it as a flagpole.  And as the court can see from the video,

he does have his Trump flag affixed to the hockey stick.

THE COURT:  I am sorry to tell you, I have seen way

too many videos where flagpoles were used as weapons that day.

1      MS. MULLIN:  Right.  And we're not disputing he used

2  it as a weapon.  What we submit is that, when he left his house,

3  he didn't intend to carry it as a weapon.  He intended to carry

4  it as a flagpole.  When he got there, there is no dispute he

5  used it as a weapon.  We conceded the dangerous weapon enhancement

6  would apply, whether the court applied 2A2.4 or 2A2.2.  That's

7  not a question.

8      THE COURT:  Okay.

9      MS. MULLIN:  When he got to the Capitol, Dr. Guarnera

10  writes that, you know, he encountered a perfect storm of

11  circumstances that would trigger his posttraumatic stress

12  hyperarousal, and at that time he was particularly susceptible

13  to aggressive action and poor decisionmaking.

14      Now, we are not saying that his mental health condition at

15  the time is a perfect defense.  We did not go to trial.  We did

16  not -- Mr. Foy did not raise those as affirmative defenses.  But

17  we do submit that they are mitigating factors that this court

18  can consider in assessing all of the 3553(a) factors including

19  the nature and circumstances of the offense.

20      By all accounts -- and the government cannot dispute

21  this and did not dispute this -- his conduct was a complete

22  aberration from the gentle, kind, even meek person that everyone

23  describes him as.  I think one of his Marine buddies described

24  him as the least violent person he's ever met.  And I think,

25  honestly, it's his lack of aggression and sort of his meek

character that contributed to him having problems in the
Marines.  He's just like the least aggressive, nonviolent person
you'll ever meet according to everyone who knows him.

After January 6, Michael's regret was immediate.  He felt
so low when he was in the Michigan jail that his lawyer reported
to us that he had attempted to take his own life again.

Now, we have tried to address the myriad circumstances
that brought Mr. Foy to the place where he was on January 6,
but I would be remiss if I didn't focus on his extraordinary
rehabilitation since this court released him.

Mr. Foy is not just someone who complied with conditions
of release.  He is someone who seized the opportunity and built
his life up from the ground up.  He didn't just go to therapy to
check a box.  He went to therapy, he dove in, did the hard work
that you hear about that people do in therapy, processing the
lessons that he learned while he was incarcerated.

And he did the hard work because he knew he had to improve
himself.  He didn't just go out and find a job; he found a
vocation.  He found a group of coworkers who love him and
support him.  He didn't just go punch a clock.  He takes pride
in his work.  He gets there early.  He works through lunch.
He takes pride in making his customers happy and doing a good
job.  His job gives him a sense of purpose and achievement that
he never felt before.  And he joined a church.

And, Your Honor, I've heard this from a lot of January 6

clients, including Mr. Foy, but after two years of lockdown
and isolation, people were looking for a connection, a sense of
community, a cause to rally around.  Donald Trump and his allies
exploited that feeling, that sense of loneliness, that sense of
lack of connection, and Michael fell prey to it just like so
many people who went to January 6.  But now he has a sorely
needed sense of community with his church, his coworkers, and of
course he's always had that with his fiancée, Sophia, who does
not live in the United States.

Mr. Ohm and I acknowledge that our request is a significant
variance from the court's guideline range.

THE COURT:  Ms. Mullin, you're asking me to give
him time served.  I mean -- you know, the government's at one
extreme at 97 months, and you're at the other extreme with no
jail time other than what he's already served.  I mean, neither
of you have given me much to hang my hat on here.

MS. MULLIN:  Well, I think with all of the factors
the court has to apply, we have given the court enough for a
significant variance.

THE COURT:  I don't disagree.

MS. MULLIN:  The Supreme Court and other district
judges have recognized that in extraordinary cases -- there are
extraordinary cases outside of the heartland of the guidelines,
and we submit this is one of them.  And that's *Rita v. United
States*.  I know the court's familiar with it.  Each of the

purposes of sentencing are met with a sentence of five months.

With respect to just punishment, Mr. Foy has been incarcerated.  He's been on a GPS monitor every day for over two years.  He will have restitution in this case.  He's agreed to restitution.  He's not disputing that, of course.  He will have a felony conviction, which will hamper him for the rest of his life.  These are punishments that the court can consider in assessing what is a just punishment for his conduct.

THE COURT:  I have that in every felony.  Every person who comes in here for a sentencing on a felony is going to have a felony conviction; they're going to have a pay a restitution.  That's a starting point.  What you're telling me is that that's enough.

MS. MULLIN:  Well, that plus the five months, plus the continued supervision this court would have to put him on, we do submit it's enough given the unique circumstances of this case.  He has demonstrated that the five months he spent at CTF are more than sufficient to deter him.

Now, as for general deterrence, I would submit that putting Michael in prison isn't going to deter anyone if Trump or Biden or anybody else decides to try to inflame a political riot.

THE COURT:  Really?

MS. MULLIN:  Yes.

THE COURT:  You don't think the fact that people out there assaulting the police, getting jail terms, is not going

1    to make somebody else think, hmm, maybe not?

2              MS. MULLIN:  I think, especially when you have the

3    powerful organizers of the rally still in positions of power --

4              THE COURT:  I'm not getting into that.

5         (Laughter.)

6              MS. MULLIN:  Well, not only Mr. Trump.  You've still

7    got members of Congress --

8              THE COURT:  Also not getting into that.

9         (Laughter.)

10             MS. MULLIN:  I don't think that locking up an obscure

11   man from Michigan, a vulnerable man with little financial means,

12   is going to deter anybody.  I really don't.  In fact, I think

13   what would serve as a better deterrence is Michael talking to

14   people in his community, not about politics but about the dangers

15   of falling for propaganda and for lies and for, as Michael said

16   in the video, extracting yourself from toxic situations.

17        That's what I think would serve as a greater deterrent than

18   locking this man away for a couple of years.  Nobody's going to

19   look at that and say, oh, that's not going to stop me from going

20   to the next Trump rally or Biden rally.  That's my argument.  I

21   know the court is looking at me skeptically, but I've represented

22   a lot --

23             THE COURT:  You have.

24             MS. MULLIN:  -- of clients, and I just don't think the

25   amount of time is serving to deter anybody.  And studies support

1  this.  Studies support that it's the fact of getting caught that

2  serves as a general deterrence, not the length of the sentence.

3  And Michael has been locked up.  He's been locked up.  His life

4  has been immeasurably changed in many ways, ironically, for the

5  good.  He has since his release.  But he has experienced

6  consequences for his conduct.

7      Of course, the sentence has to consider the need for his

8  rehabilitation.  Exhibit 3, Dr. Guarnera specifically said that,

9  you know, prison is not a place for someone with his mental

10  health conditions.  He will not be able to receive the

11  medication that has proved most efficacious for him, and aspects

12  of prison will mimic circumstances that could trigger his PTSD.

13      Now, we're not saying he's going to recidivate if the court

14  imposes prison, but we do submit that it will be better for

15  everyone, including the community, if he's able to remain in

16  the community and continuing to be able to make the positive

17  contributions that he is so clearly making.

18      With respect to those contributions to the community, I'd

19  like to share some examples that we think reflect the type of

20  person Michael is in the community.  As the court saw from the

21  letters, he recently organized a Secret Santa for his coworkers,

22  which surprised everyone and lifted their spirits.

23      After he was released from CTF, he took the time to write

24  me, Mr. Ohm, and his lawyer in Michigan "thank you" cards.  We

25  tracked down his pretrial worker, who was the worker for most

of the time that he was on pretrial release, and while she could

not write a letter to the court per policy because she is

retired, she represented that she hopes that Michael is able to

remain in the community, and that he's a wonderful person and he

was a wonderful person to supervise.  Now, that is exceedingly

rare.  In the years that I've been doing this, I've rarely ever,

ever heard that from a probation officer, a pretrial officer.

When Mr. Ohm and I went to Michigan to see Michael, we met

with his then-therapist, and she talked about what a pleasure it

was to work with Michael and to see the hard work he was doing

in therapy.

Finally, he supports his wife and is helping his wife

to pay for -- or his fiancée's schooling in the Philippines.

So in myriad ways, he is making positive contributions to his

community and the people that he knows, and we submit that a

sentence that is fair and just would be to allow him to continue

on that positive course, a sentence that would recognize that

this case is unique in its mitigating circumstances and will

promote respect for the law.

THE COURT:  Thank you, Ms. Mullin.

Mr. Foy, I think I told you before that -- I've read your

letter, and I've watched your video, but at this point, if

there's anything you'd like to say, you're welcome to do that

now.  You don't have to say anything.  I've read your letter and

watched your video, but certainly you are welcome if there's

1    anything else you want to add.  You can come on up.

2            THE DEFENDANT:  Thank you, Your Honor.

3        Appreciate you taking the time in reading the letters.  It

4    means a lot to me.  Your Honor, I just sincerely wanted to say

5    thank you.  Thank you for taking a chance on me, and thank you

6    -- I'm sorry -- I'm not a good public speaker by any means.

7            THE COURT:  That's fine.

8            THE DEFENDANT:  I'll just maybe stick with this.

9        I took your word seriously, and not a day goes by where

10   I don't say to myself, I'm not going to let you down.  I want

11   to say thank you to you and to my probation officers and to my

12   therapist for giving me the much-needed mental health help that

13   I so desperately needed.  I have learned invaluable information,

14   and I have become a different but better person for it.  Thank

15   you for allowing me to work out at the gym.

16           THE COURT:  Very important.

17           THE DEFENDANT:  Thank you for allowing me to go to

18   church, where I built a personal relationship with the Lord.

19   I am so grateful for the job that I took with my company.

20   You allowed me to build a life I so desperately needed when I

21   got out of the Marine Corps.  I will always be grateful, even

22   if I must forfeit it all now.  I hope this can be an example for

23   others to emulate.

24       After three years of reflection, I only want to make this

25   right.  I sincerely apologize.  I apologize to the police

1    officers, or police officer that I assaulted, and I apologize

2    to my country.  I accept full responsibility, and I want to say

3    thank you for your time.

4              THE COURT:  Thank you, Mr. Foy.

5         These cases are very, very difficult.  Every person is

6    complicated.  I have seen so many people in front of me who

7    never lifted a hand in violence till January 6 and acted

8    completely out of character.  But I have to take into

9    consideration the actions of the defendant on that day.

10        Before I go any further, I want to actually say that I am

11   incredibly impressed with the sentencing materials that the

12   defense has prepared on behalf of Mr. Foy and the amount of

13   work and effort and information that they gave me so they could

14   prepare for my own sentencing.

15        These cases are difficult, and as a former public defender,

16   I'm very proud of how federal and public defenders have stepped

17   up to take these cases and how hard they've worked.  So I

18   appreciate the information that I've been given.  Professionalism

19   on both sides, both U.S. Attorney's Office and the defense office.

20        And I say this because, before January 6, I had defendants

21   come in who committed violent acts, who committed drug and

22   weapons offenses, and they too have had difficult lives.  They

23   too, if given the opportunity that Mr. Foy had, perhaps could

24   have made better lives for themselves.  So it is unfortunate

25   that it took incarceration for five months to get you on the

1  right path.  And I do wonder how many other people who are in
2  prison on other kinds of offenses could benefit from that same
3  opportunity, but I digress.

4      I've done a lot of these sentencings now, and I don't need
5  to go into too much detail about my thoughts about the events
6  of January 6 because I say them every single time.  But what
7  happened that day was terrifying, both for people who were
8  watching it and even more so from the law enforcement officers
9  and other employees of the Senate and the House and the Capitol
10  who were just simply trying to do their jobs.

11      The level of violence and hostility and abuse and fear that
12  they went through that day, I can't even imagine.  Just watching
13  it over and over, I haven't gotten numb.  I'm horrified every
14  single time.  And the government is not wrong in this case to
15  emphasize the level of violence that was involved in your offense.

16      But I have to take more into consideration than just the
17  seriousness of the offense.  Section 3553(a) requires me to
18  take into account a host of factors including the nature and
19  circumstances of the offense, which I've talked about, the
20  history and characteristics of the defendant, the types of
21  sentences available, the need to avoid unwarranted sentence
22  disparity, and the need to provide restitution.

23      The sentence I impose has to reflect the seriousness of the
24  offense, to promote respect for the law, and to provide for just
25  punishment.  It should also deter criminal conduct, protect

1    the public from future crimes by the defendant, and promote

2    rehabilitation.  In every case, some of those factors weigh more

3    heavily than others.

4         In the January 6 cases in particular, I have and continue

5    to believe that deterrence is a very important factor.  I know

6    Ms. Mullin and I disagree on this, but I do think that it has to

7    be made clear that illegally entering into that building, trying

8    to stop the lawful transfer and certification of the electoral

9    results, and most importantly, assaulting law enforcement officers

10   who were just there, outnumbered, oftentimes ill-equipped and

11   trying valiantly to do their jobs and protect the people who were

12   inside that Capitol, as well as the country, deserves significant

13   consideration.

14        I have heard from officers who were there that day,

15   including Officer Gonell in a previous hearing, about what it

16   was like not knowing if they're going to make it home to their

17   loved ones.  I have heard from people who were working there

18   not knowing if they were going to live or die, and who were

19   hiding under their desks and calling their families in terror.

20   So I think there have to be significant consequences for that,

21   and that level of violence is horrific.

22        But then I also have to consider the history and

23   characteristics of Mr. Foy, who served his country honorably in

24   the military.  That cuts two ways.  I do consider your military

25   service and what you went through as part of that service.

But I also consider that you took an oath to serve your country, and you knew better.  You knew better.  Because your oath was to serve your country, and what you were doing there on January 6 was not serving your country.

As I said before, it is unfortunate that it took you being incarcerated for five months and then being represented by Mr. Ohm and Ms. Mullin, who were able to help you get the services that you need, for you to turn yourself around.  So rehabilitation is actually not one of the big factors that weighs heavily on me in this case because you've already begun your rehabilitation.

What Ms. Mullin said in her allocution was one of the things I have noted over and over again in these cases, which is the need for connection, the need for community.  I see so many defendants coming before me who found a community and a connection and a purpose in protesting what they viewed as a stolen election, meeting other people who shared their points of view, coming to Washington, marching together, acting together, and it reinforces my belief that people in groups act in ways that they would never act alone.

I'm sure when you see that picture of yourself swinging that hockey stick, you don't recognize yourself.  I can't tell you how many times I've had family members of defendants look at videotape and say, "I don't recognize that person."

THE DEFENDANT:  That is correct, Your Honor.

THE COURT:  But that was what you were capable

1    of doing.

2              THE DEFENDANT:  That's correct.

3              THE COURT:  And that's what you did on that day, and

4    that has to be punished.  So it is a very, very, very difficult

5    situation that I am confronted with, because you've already

6    begun on your path to rehabilitation.  You have expressed

7    remorse.  You do seem to recognize the seriousness of your

8    actions.  But there have to be consequences.  There has to be

9    restitution.  You've agreed to provide that.  And I have to

10   consider the type of sentences available.

11       The government wants me to give you 97 months, top of the

12   guidelines.  I think that's unreasonable and doesn't take into

13   consideration all the 3553(a) factors.  Your lawyers want me to

14   give you time served, and I don't think that's appropriate

15   either given the level of violence that was involved in this.

16   So I have to find a balance.

17       And frankly, I'm concerned about the progress that you've

18   made, given the fragility of your situation before you were

19   arrested, that any custodial sentence I give you is going to

20   result in an unravelling of all that progress.  I hope not.

21   I hope not.  And I do think you have the strength of character

22   that it won't, but it is a concern of mine.

23       But I also have to take into consideration the severity of

24   the offense, the need to provide adequate deterrence.  And in

25   terms of disparity, I've looked at the cases that the government

has cited.  I've looked at my own cases in which I've sentenced defendants to significant periods of incarceration.  I don't think that the government's cases are necessarily appropriate.

I noticed that the two cases I mentioned to Mr. Beckwith, the defendants had significant criminal records and were given sentences shorter than what they're asking you to get.  I myself sentenced two individuals, Robert Palmer and Mark Ponder, to terms of 63 months for violence that is comparable to the violence that you engaged in, and both those individuals had significant criminal histories.  Significant.  You have none.

You did serve your country for four years in the Marine Corps.  It's clear to me that when you committed this offense, you were at a very low point in your life.  You were alone, dealing with posttraumatic stress disorder and other mental health issues without any help or without proper medication, and also dealing with a particularly difficult and stressful family situation; and you had no one to support you, and you felt free to -- well, you embraced certain beliefs, which I assume you have come to realize were based on misinformation.

I'm not sentencing you because of your political beliefs. I do not care who you believe should have won the presidency. I don't care whether you believe the election was stolen or not. What I care about is what you did, because a whole lot of people, millions and millions of people, felt the same way you did, and they didn't come to the Capitol and storm the Capitol,

1    and they didn't assault law enforcement officers.  So you have a

2    right to believe what you want to believe to this day.  That's

3    not why I'm punishing you.  I'm punishing you for what you did.

4        I don't believe that a within-guidelines sentence is

5    warranted here, and I'm not going to give it.  The sentence I

6    am going to impose would be the sentence I would impose even

7    if I had not found the enhancement that your lawyers urged me

8    not to apply.

9        All right.  If you could stand, Mr. Foy, Ms. Mullin.

10       Based on all my considerations of the 3553(a) factors, it

11   is the judgment of the court that you, Michael Foy, are hereby

12   committed to the custody of the Bureau of Prisons for a term of

13   40, four-zero, months.  The 40 months is on both counts, to be

14   served concurrently, followed by a term of supervised release of

15   two years.  You are further ordered to pay $2,000 in restitution

16   in addition to a $200 special assessment fee.

17       I'm not going to impose a fine in this case because I

18   believe that you will be unemployed and that you had a

19   significant history of unemployment.  You haven't been employed

20   that long, and I don't want you to be destitute when you're

21   released.  The special assessment and the fine are immediately

22   payable to the Clerk of the Court for the District Court of the

23   District of Columbia.  Within 30 days of any change of address,

24   you shall notify the Clerk of the Court of the change until such

25   time as the financial obligation is paid in full.

1    With regard to custodial conditions, I don't really have

2    any.  I don't have any.  I think you have been doing the work.

3    I think you should avail yourself of whatever programs there are

4    that will allow you to continue along your mental health

5    progress and any kind of job training programs, but I'm not

6    going to order any particular custodial conditions.

7    While on supervised release, you must abide by the

8    following mandatory conditions:  You must not commit another

9    federal, state, or local crime.  You must not unlawfully possess

10   a controlled substance.

11   I'm not going to impose drug testing in this case because

12   I don't believe it's necessary.  The drug-testing condition is

13   therefore suspended based on the court's determination that you

14   pose a low risk of future substance abuse.

15   You must pay the special assessment imposed of $200.  You

16   must notify the court of any material change of your economic

17   circumstances that might affect your ability to pay restitution.

18   You must make restitution in accordance with 18 U.S.C. § 3663A

19   and any other statute authorizing the imposition of restitution.

20   You must cooperate in the collection of DNA as directed by

21   the probation office.

22   In addition to the probation office's discretionary

23   conditions of supervision found in Part D of the presentence

24   report, the court will order you to comply with the following

25   conditions while on supervised release:  You shall remove

1  firearms, destructive devices, or other dangerous weapons from

2  areas over which you have access or control until the term of

3  supervision expires.

4      You must work full time, at least 30 hours per week, at a

5  lawful employment unless the probation officer excuses you from

6  doing so.  If you do not have full-time employment, you must try

7  to find full-time employment unless the probation officer excuse

8  you from doing so.

9      If you plan to change where you work, or anything about

10  your work such as your position or job responsibilities, you

11  must notify the probation office at least 10 days before the

12  change.  In notifying the probation officer at least 10 days in

13  advance, if such notification is not possible, you must do so as

14  soon as possible, at least within 72 hours of being aware of the

15  change.

16      You must not act or make any agreement with a law

17  enforcement agency to act as a confidential informant or

18  informant without first getting permission of the court.

19      You must participate in a mental health treatment program

20  and follow the rules and regulations of that program.  The

21  probation officer, in consultation with the treatment provider,

22  will supervise your participation in the program, and you must

23  take all mental health medication that is prescribed by your

24  treating physician.

25      Any objection to the discretionary conditions of supervised

1    release that I've imposed, Mr. Beckwith?

2             MR. BECKWITH:  No, Your Honor.

3             THE COURT:  Ms. Mullin?

4             MS. MULLIN:  No, Your Honor.

5             THE COURT:  All right.  Probation office shall release

6    the presentence investigation report to all appropriate agencies

7    to execute the sentence of the court.

8        Mr. Foy, you can appeal your conviction to the Court of

9    Appeals if you believe that your guilty plea was somehow

10   unlawful or involuntary or if there's some other -- well, you

11   didn't plead guilty, I believe, because you entered a stipulated

12   trial.  You still have your appellate rights preserved, and you

13   have a right to appeal the sentence imposed by the court subject

14   to whatever rights of appeal you waived in this case.

15       If you choose to appeal, you must file an appeal within 14

16   days after I enter judgment, and if you are unable to afford the

17   cost of an appeal, you may request assistance from the court to

18   file an appeal without cost.

19       Now, do you have any requests for a recommendation as to

20   where Mr. Foy will serve his sentence?  Obviously, you'll get

21   credit for the time you've already served.

22            MS. MULLIN:  We would ask the court to recommend

23   Butner or another FMC.

24            THE COURT:  I will happily recommend Butner because I

25   think that is where he could get the continued therapy he needs;

1   I think it's unlikely because Mr. Foy's medical conditions are

2   not severe as -- you know.  There's a severe shortage of

3   appropriate treatment in the Bureau of Prisons.  I am not the

4   only judge who's frustrated with that, but I'll certainly make

5   that recommendation.

6          MS. MULLIN:  Thank you, Your Honor.

7          THE COURT:  Now, you have been completely exemplary

8   in following your conditions of release.  I have never heard a

9   Pretrial Services officer speak up for a supervisee, and that's

10  to your credit.

11      And I'll tell you, Mr. Foy, I really hope -- I sentence you

12  to this time of incarceration with a very heavy heart because

13  I'm very impressed by the progress that you've made.  And I

14  really hope -- well, first of all, you have every right to be

15  proud of that.  I'm sorry it took your being incarcerated for

16  five months to jump-start that process, but whatever it took,

17  I'm glad it happened.

18      I want you to build on that.  I think you can.  I really

19  think you can, regardless of whatever time I give you to serve.

20  But because you complied with your conditions of release, I am

21  going to allow you to voluntarily surrender and have some time

22  to get your affairs in order.  So I will allow you to voluntarily

23  surrender.  Your lawyers will consult with the probation office

24  and let you know what day you must surrender.

25      If you don't surrender on the day that's been set for your

1     voluntary surrender, you could be charged with another felony

2     and be subject to an enhanced penalty consecutive to any

3     sentence that I give you in this case.

4          If you commit another crime while on release pending

5     sentencing, you could also be subject to an enhanced penalty,

6     and if you violate any of the conditions of release, as you

7     know, I can revoke those conditions and have you begin serving

8     your sentence immediately.  I don't want to do any of those

9     things, so continue along the path you've been working on.

10               MR. COLE:  Your Honor, could we be heard just for one

11    moment, please, on that issue?

12               THE COURT:  Yes.

13               MR. COLE:  We respect the court's decision, as always,

14    and we do so without reservations.  But the government

15    respectfully, for the record --

16               THE COURT:  I'm sorry.  I should have asked you.  Yes.

17               MR. COLE:  I just wanted to state for the record, and

18    I'm not quarreling with the Court's decision, but I think the

19    record should reflect that we would have asked for an immediate

20    step-back.

21               THE COURT:  Yes.  And I should have asked your

22    position before I stated it, and I appreciate that.  Given the

23    violence that is involved in this case, I don't think that's an

24    unreasonable position.  But Mr. Foy has been on pretrial release

25    for two years now and has not shown any indication that he would

1    pose a threat to the community or that he would not show up.

2    He's shown up for court, all his hearings, whether remote or in

3    person.  Therefore, I do find that he's unlikely to flee and poses

4    no danger to himself or the community, so I will continue to

5    order his supervision on pre-surrender release.

6        I am perfectly aware of the difficulty that you faced while

7    incarcerated.  I have spent a lot of time in prisons and jails

8    back when I was a public defender, and I don't deprive you of a

9    day of liberty unaware of what that means and the significance

10   of what that means.  So I appreciate the seriousness of the

11   sentence.

12       But a very wise man named Bryan Stevenson said that we

13   are not the worst thing we've ever done.  And your actions on

14   January 6, while serious, and while warranting punishment, do

15   not define you, and they are not the entirety of who you are.

16   And you're a young person.  You have a long life ahead of you.

17       And the strength of your character and your integrity is

18   shown not just in the mistake that you made -- and it was a

19   serious one -- but in how you live your life going forward.

20   And I believe you have the capacity to live a long, productive

21   and law-abiding life and to let others know that they shouldn't

22   make the mistakes that you made.  So I wish you the very best of

23   luck, Mr. Foy.

24            THE DEFENDANT:  Thank you, Your Honor.

25            THE COURT:  All right.  Is there anything further?

1          MR. COLE:  Not from the United States, Your Honor.

2     Thank you.

3          MS. MULLIN:  No, Your Honor.

4       (Proceedings adjourned at 11:53 a.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne